Eugene Fisher **LONDOS** and Adrian Law-
rence Dudley, Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 16045.

United States Court of Appeals
Fifth Circuit.

Jan. 9, 1957.

Rehearing Denied Feb. 20, 1957.

1

**2**

Stanley D. Baskin, Pasadena, Tex., Percy Foreman, Houston, Tex., for appellants.

James E. Ross, Asst. U. S. Atty., Houston, Tex., Malcolm R. Wilkey, U. S. Atty., Houston Tex., for appellee.

Before RIVES, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a conviction of the appellants of the offense of causing, with unlawful and fraudulent intent, to be transported in foreign commerce from Acapulco, Mexico, to Houston, Texas, a falsely made, forged and counterfeited security in violation of 18 U.S.C.A. § 2314.[1] Appellants were also indicted for a conspiracy to commit the offense. They were acquitted of this charge.

The falsely made security was made in Acapulco, Mexico, and was brought by the complaining witness, a Mrs. Ethel Turner, to Houston, Texas. The theory of the Government was that the two appellants caused her to bring it to Houston as a part of a horse race swindle in which Mrs. Turner turned over $22,500 cash to them, which they then purported to mingle with their own funds in Mexico which they held out to her were to be "transferred" to Houston for collection. The transfer was by means of sending the security to Houston.

Credible evidence before the jury painted this picture: Mrs. Turner, a resident of California, went to Acapulco alone for a vacation. She was not living with her husband, although there had been no divorce. The day after her arrival she met Dudley, who introduced himself to her and was thereafter known to her as Harry Marshall. He became her constant daytime companion for several days, and they exchanged their life stories. On December 17th, while having breakfast together, Dudley said he found a wallet under the table. He examined its contents and showed her $600 in $100 bills and a $20,000 race ticket for the afternoon of the 17th. He also showed her a letter in the wallet which he read to her. It purported to be from one O'Hara, a shadowy figure throughout the recitation, and was addressed to George A. Holden. It cautioned Holden not to discuss his business with anyone on pain of his, Holden, losing his job. Mrs. Turner suggested to Dudley that he phone Holden and tell him they had found the wallet and ask for the $600 as a reward. He refused and said they should go to see him (thus, as argued by the Government, establishing him as an honorable man). She objected to going with him but he insisted and she accompanied him. Since Holden's address at a fancy club was on the letter they took the wallet to the address and there "introduced" themselves to Holden, who is appellant, Londos, travelling under an alias. They went up to Londos's room and there, after Dudley permitted Londos to identify the wallet

---

1. "Transportation of stolen goods, securities, monies, or articles used in counterfeiting

    *    *    *    *    *

"Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities, knowing the same to have been falsely made, forged, altered, or counterfeited; * *.

"Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. * * *" 18 U.S.C.A. § 2314.

and turned it over to him, Mrs. Turner asked Londos if it was not worth the $600 to him for them to return the wallet with the $20,000 race ticket. Londos replied that he was just a salaried man with a wealthy uncle who had kept his job for him with a horse raising company which had sent him down to bet on some races. This betting of his company was on the quiet, he said. The bets were placed in Acapulco at the "Turf Exchange." Londos told them he got his information an hour before the race as to which horse to bet on. He said the races were fixed so, of course, they would always win. After some discussion he said, "I guess I could give you $100 each." He held out the $100 bill to Mrs. Turner and then said: "Oh, I got another idea," and took it back before she reached for it. "See on this race today, on this $20,000 they pay three to one * * * if I put on those six hundred dollars we get eighteen, then I will have my $600 and each of you will have $600."

Holden then told Dudley to go to the "Turf Exchange" and make the bet. Dudley went with a "membership card" in the Turf Exchange. Londos then left. A short while later they returned together and told Mrs. Turner they had won the $60,000 which had been credited to Londos's "company" and they had won the $1800, which they showed her in a pack of bills. Londos sat down as if to start dividing up the $1800, but then he had another idea. He told Dudley he would make a big bet for $100,000 by giving a company check; he couldn't do it himself because he would be known, so Dudley would have to place the bet; he told Dudley the check should also have O'Hara's signature, but they might let it get by without the signature; if they didn't, then Dudley should bet the $1800. Londos told Dudley and Mrs. Turner that since it was his money he would take 75% and let them split 25%. So Dudley left again and soon returned saying he had bet both the $100,000 and the $1800. There was a little criticism from Londos about his betting the $1800 as well. Dudley showed Mrs. Turner a bet ticket made out to A. B. Marshall (Dudley), "C. D." Turner (Mrs. Ethel Turner) and George A. Holden (Londos).

After lunch Londos went off and soon came back and announced "We won!" There was much excitement and celebration. Londos then gave Dudley his "membership card" and told him to go get the money. Dudley left and soon returned with a bag full of money (purportedly the $203,600 in cash). Packages of money were dumped out on the bed and "Mr. Holden (Londos) sat down supposedly to figure out how much each one is going to get." Suddenly Dudley said he had overheard a remark at the window that made him think he had better get back the improperly signed check and he asked them for it, whereupon they noticed the absence of O'Hara's signature. When they asked him about that he left. Thereupon, for the fourth time, before Mrs. Turner could feel a dollar of the rapidly multiplying hoard, Londos put the money back into the bag and told Dudley, "Go right back and give it back to them and tell them I will be right over there and straighten it up." Dudley disappeared with the money and then returned with the same race ticket. Thereupon Londos left to "straighten things out because O'Hara's name was not on the check." He soon returned with the sad news that they wouldn't pay off the bet because if the bettors had lost the race their check was not negotiable and couldn't have been cashed; therefore before they could get their "winnings" they would have to show that they had the cash to cover the $101,800 bet.

Thereupon Londos talked about his rich uncle and went out to phone him. Unable to reach him he said he would get a wire later. Then he got a telegram from his aunt who broke the sad news that the uncle was sick in the hospital but that she had $25,000 he could have. Then Dudley did some figuring and said to Mrs. Turner, "I could raise $42,000." Then, rising to the well prepared bait, Mrs. Turner said to Dudley "Well, I could raise $25,000." Londos then said:

"There is already sixty-five and twenty-five * * * and I could wire my wife and I have got a little money she would send me $10,000." Mrs. Turner then asked if she couldn't show her bank books instead of getting the cash. Londos said "No, the bank books will not be any good." The jury could well have inferred that Londos's reason for putting incorrect initials with her name on the betting ticket was to make it impossible for her to use bank books.

When it became clear that all of them would have to produce money to make the proof at the window, Dudley insisted that instead of the split of 75% to Londos, 12½% to him and 12½% to Mrs. Turner, they split the winnings one-third each. They further discussed how to get the money and Dudley arranged the transportation for Mrs. Turner to fly to San Diego and Los Angeles, and said he would fly to his home in Baltimore. Both Dudley and Londos told Mrs. Turner not to tell anyone she was getting the money. She went to San Diego and got $3,000, and to Los Angeles and got $19,500 by borrowing against her savings account and by selling some bonds. She talked with Londos twice on the phone while in California, the last time telling him she could only raise $22,500; whereupon he told her he would make arrangements to get the difference. He assured her that Dudley would be back on time. She flew back, arriving in Acapulco on December 24th, on which day she took out her money and put it in a paper bag they produced and into which the others also put paper wrapped bundles of their money. Londos said they would have to take it to the track to be counted and Dudley had the bag ready to go when Mrs. Turner said she wanted to go, thinking all three of them could show the money. Londos said only one could go and sent Dudley. When Dudley returned without the money he had a check made payable to the three names, saying all of them had to endorse. They all signed and just before Dudley went back to get the cash on the check Londos said he wanted to make still another bet with his part of the winnings. Dudley went on purportedly to get the cash for himself and Mrs. Turner and place Londos's money on another bet, but when he returned he told Londos and Mrs. Turner that he had placed the whole $203,600 on a later race. Mrs. Turner protested and got hysterical. Londos said there was still time to stop the bet. He sent Dudley back to stop the bet and get the money. Dudley returned breathless and said he had stopped the bet, but in his rush he had knocked a woman down and had rushed away without getting either the money or the ticket or anything. Of course, he did not dare go back because "they" would be looking for him. Londos then went to collect the money (although originally he couldn't be seen in the transaction) and to pay off the injured woman. Londos left, and having stayed long enough for Mrs. Turner to get nervous, she and Dudley went out in search of him purportedly at the office of the Turf Exchange. When they got there Dudley left her in the taxi and went inside the building and stayed until she became nervous and impatient, whereupon she got out of the taxi, and Dudley "came right out." He told her Londos was talking to the manager and that he had suggested that they go to the hotel where he would join them in a few minutes.

Londos then came to the hotel and told Mrs. Turner and Dudley that he didn't have time to complete the deal because he learned that the "woman he [Dudley] knocked over that was the senator's wife and he can't buy her off." So, Londos said he had asked for a transfer to Houston. He thereupon produced the "check," (Government's Exhibit H) made payable to the same three payees at "Branch number 32, Houston, Texas." He said he had asked for the transfer to Houston because he had been transferred by his company to Houston, that he was "going to be in the Houston office" on Monday.

As to the critical issue of transporting the document in foreign commerce the following excerpt is reproduced from the record of the trial:

"A. Well, when Mr. Holden got the check and Mr. Marshall looked at it and I looked at it and he said, 'you don't have to worry a thing about it,' and he put it on the chiffonier like and like that and then he says, 'You don't have a thing to worry about; this is good as gold. They have to pay, you don't have to worry.' He says, 'If they didn't, this will be good in any courts; don't worry about it.' Because I sort of looked worried he says, 'You don't have to worry a thing about it.' Then we started to discuss who was going to handle this and Mr. Marshall said he wants to keep it; I says, 'Oh, no, I want to keep it. After all, what have I got to show? Nothing.' I said, 'I am going to keep it.'

"So Mr. Marshall still insisted, so I raised my voice. I says, 'Oh, no, I wouldn't stand for it. I am going to keep it.'

"Mr. Holden says, '*O. K. let her keep it.*' Then he says, '*Remember, take care of it and you be in Houston like I told you to.* If you are not, I am going to chase you all over.

"And I says, 'You don't have to chase me, Mr. Holden. I give you my address. You have got my home address. I will be in Houston, just as I told you I will.'

"Q. Was there any discussion about where you would be in Houston? A. Yes, sir, he told me where to go. He says, 'You go to the Rice Hotel.' And he told Mr. Marshall to go to Dallas to the Baker Hotel. And then while me and him meet her and we discuss when we are going over there, we will call Mr. Marshall and we will come in and all three of us is going to United Turf Exchange.

"Q. And where was that going to take place? A. At Houston.

"Q. At Houston. A. Yes, sir.

"Q. Was there any discussion about when you would leave? A. Yes, sir. Mr. Marshall was leaving immediately because he was afraid of being chased for that woman that he knocked over." (Emphasis added.)

So, the parties separated on Christmas Eve with Mrs. Turner's having parted with her money and having in her possession for delivery to Houston, Texas, the "security," which had been produced by Londos and had been described by Dudley as "good as gold."

Arriving in Houston on the appointed day with the "security" and registering at the designated hotel, Mrs. Turner got a phone call from Londos saying he and Marshall would come for her at 11 o'clock the next day, the 28th. Instead he phoned her at 11 o'clock on the 28th and told her the bad news. He had been suspended from his company "and I can't do a thing about this order, this credit for the Turf Exchange now. I will have to go back to New York and establish myself again through my uncle. And you go home and I will call you again in sixty days."

The fade-out followed quickly. Mrs. Turner testified:

"I says, 'You mean to tell me what happened. You going your way to New York; you don't mean to tell me I lost my money?'

"He says, 'Now, listen; we are going to do things my way. You and Marshall messed up things enough until now. You do as I say to do. I am at the airport right now and I am leaving for New York.'

"And I started already about that time getting hysterical. I said, 'Mr. Holden, you don't mean to tell me I lost my money? Mr. Holden, you don't mean to tell me I lost my money?'

"I saw he was quiet for a minute and he said, 'Mr. O'Hara is coming right now and I can't talk to you any longer because Mr. O'Hara is coming toward me right now.' And he lightly hung up the phone. I could hear it just lightly go on."

Mrs. Turner was unable to locate any United Turf Exchange in Houston and failed to find its name in Acapulco when she went to the offices. She did not see Dudley again until the trial and saw Londos only in a police lineup for identification purposes after his arrest in Jacksonville, Florida. The appellants do not contend on this appeal that there is not sufficient evidence of the worthlessness of the "security."

■ The appellants' attack on their conviction is four-fold. There were seven assignments of error. Appellant treated 1, 3, and 4 together, asserting that whatever offense was committed was committed in Mexico and not within the jurisdiction of the United States. It is their theory that since the statute does not define "in foreign commerce," the Government must rely on the definition of foreign commerce contained in 18 U.S.C.A. § 10, which states: "The term 'foreign commerce', as used in this title, includes commerce with a foreign country." Appellants contend that commerce with a foreign country comprehends shipment or transportation *to* but not *from* such country. That the contrary is the true rule is implicit in our judgment in Ramey v. United States, 5 Cir., 228 F.2d 774, rehearing denied 230 F.2d 171. The statute there construed is the same as is involved here. We held that foreign commerce comprehends transportation *from* the foreign country into the United States. To the effect that "commerce" means passing to and fro see Whitaker v. United States, 9 Cir., 5 F.2d 546.

Under these three specifications appellants also contend that all elements of the offense, if any, were completed in Mexico. The Government answers by pointing to 18 U.S.C.A. § 3237, which provides as follows:

"Any offense involving the use of the mails, or transportation in interstate or foreign commerce, is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce or mail matter moves."

■ It seems clear that upon the proof introduced on this trial there was evidence of the act of transportation of the security into the Southern District of Texas, and if the other elements were present, tying either or both of these appellants into the transportation prohibited by the statute, the district court had jurisdiction of the offense and the venue was properly laid there.

The next attack was specification 2. The indictment reads in part as follows:

"Count Two

"That on or about the 24th day of December, 1954, within the Houston division of the Southern District of Texas, and within the jurisdiction of this Court one Eugene Fisher Londos alias George A. Holden and one Adrian Lawrence Dudley, alias Harry Marshall, did with unlawful and fraudulent intent cause to be transported in foreign commerce from Acapulco, Mexico, to Houston, Texas, a falsely made, forged, and counterfeited security, to wit: Check Number 4655 dated December 24, 1954, drawn on the United Turf Exchange payable at branch No. 32, Houston, Texas, to Messrs. George A. Holden, A. B. Marshall, and C. D. Turner in the amount of $203,600.00 and signed 'Mark Howard', and bearing the notation 'Customer's draft transferred Acapulco to Houston, Texas', the said defendants then and there well knowing the same to have been falsely made, forged, and counterfeited. (Violation Title 18, Section 2314, United States Code.)"

■ The appellants complain that the indictment did not allege that they *willfully* caused the falsely made, forged, or counterfeited security to be transported in foreign commerce. The burden of appellants' argument is that under the so-called "Principals" section of the Code, 18 U.S.C.A. § 2, it is provided: "Whoever *willfully* causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a

principal." (Emphasis added.) The facts set out in this indictment do not allege that Mrs. Turner's act of transportation was a crime, because it is not alleged that she "with unlawful or fraudulent intent" transported the security. She, of course, according to the indictment and to the proof, thought the security was good. That it was spurious gives rise to the unlawfulness and fraud. A simple allegation that appellants caused to be transported a "falsely made, forged, altered, or counterfeited" security in foreign commerce would not of course have been sufficient. Under general principles of the law of principals an aider and abettor who procured the unlawful act of another was guilty with him as a principal. Nye & Nisson v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919. Here, however, the indictment does not charge that these appellants caused Mrs. Turner to do an unlawful act, because as we have said, it is not charged that she did an unlawful act. For any crime to be committed here it is necessary to prove that what the *appellants* did was unlawful even though their agent was without knowledge of the part she was playing in the drama. The situation here may be likened to a highly fictionalized example. Suppose A wanting to murder B procures C to administer to B what C thinks to be medicine, but is known to A to be a deadly poison. No crime is committed by C, but A is undoubtedly guilty of murder. In an indictment for such a crime it would have to be alleged that A had the criminal intent to kill B. Here, too, it is necessary for the indictment to allege that appellants had the criminal intent to have the false security transported. This is not because the statute on principals requires proof of willfulness, but because of the requirement that to constitute a crime the false security must be transported with unlawful or fraudulent intent. This requirement was satisfied by the allegations that appellants caused the transportation unlawfully and with fraudulent intent. The indictment is adequate without reference to the section on Principals. Even if it were necessary for the Government to allege its case

within the terms of 18 U.S.C.A. § 2(b) the allegation that appellants unlawfully and fraudulently caused the transportation is a sufficient allegation that they *willfully* caused it. Rumely v. United States, 2 Cir., 293 F. 532, certiorari denied 263 U.S. 713, 44 S.Ct. 38, 68 L.Ed. 520; Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861.

■ The appellants next contend by specifications number 5 and 6 that as to each of them separately there was insufficient evidence to support a verdict that either of them caused Mrs. Turner to transport the security to Houston.

We think a perusal of the abbreviated statement of facts quickly discloses the fallacy of this contention. Both men participated intermittently in every single step of the proceedings from the pretended placing of the $600 bet for her benefit, the handling of the money, the running back and forth between the hotel room and the Turf Exchange, the production of the first check and its endorsement, the placing of the final bet without her consent, to the final farce of taking the money back and coming back empty-handed and finally producing the spurious security that she was told was "good as gold" but had to be presented in Houston. The emphasis on her words in insisting that *she* take it instead of Marshall (Dudley) keeping it could be, and doubtless was found by the jury to be, a clever attempt to make her act in transporting the security her own act and not one caused by them. While we agree that it was done of her own volition at that stage of the sorry game it could also be found by the jury that her action in this respect was *caused* by them. The evidence was ample to support the verdict on the facts as to each appellant.

■ Finally, appellants object that the acquittal on the conspiracy count was inconsistent with the verdict of guilty on the substantive count and that to permit the substantive count to stand would amount to subjecting appellants to double jeopardy. This contention has been fully answered in our recent case of Ehrlich v. United States of America,

5 Cir., 238 F.2d 481, 485,[2] and Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435, affirming this Court's opinion in 202 F.2d 830; see also Gavieres v. United States, 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489. Moreover, here the proof required on the substantive count was different from that on the conspiracy count. The essential element of such different proof was that under the conspiracy count an agreement must be shown. The jury may well have believed that one of the defendants concocted the scheme of getting up the transfer of funds and that the other fell in with the idea when it became apparent that Mrs. Turner was becoming hysterical and then they each caused her to do the act without any prior agreement.

We think the verdict can be supported by the evidence and that there were no errors of law requiring a reversal.

The judgment is

Affirmed.

2. In the Ehrlich case we said:
"Of the remaining assignments, that the acquittal on the conspiracy counts bars a conviction of the substantive count, it is sufficient to say that the rule is universal and without exception that consistency in a jury verdict is not required. When an indictment contains multiple counts, a jury verdict of guilty on some and not guilty on others is not an inconsistency requiring an acquittal on all. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356; Freeman v. United States, 5 Cir., 96 F.2d 13; Mogoll v. United States, 5 Cir., 158 F.2d 792. Neither is a conspiracy count the

same as, nor may it be merged with, a substantive count dealing with the same matters. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489. Besides, there is no inconsistency in fact

in a verdict finding that the veterans, the alleged co-conspirators, were not such and one finding the defendant guilty of the substantive offense."