265 F.2d 894
 George B. PARR, D. C. Chapa, B. F. (Tom) Donald, Jr., Jesus G. Garza, Santiago Garcia, Octavio Saenz, Jesus Oliveira, O. P. Carrillo, Oscar Carrillo, Sr., Texas State Bank of Alice, Alice, Texas, and San Diego State Bank, San Diego, Texas, Appellants,
v.
UNITED STATES of America, Appellee.
 No. 17071.
 United States Court of Appeals Fifth Circuit.
 April 6, 1959.
 
 T. Gilbert Sharpe, Brownsville, Tex., Percy Foreman, Houston, Tex., Luther E. Jones, Jr., Corpus Christi, Tex., and Sharpe, Cunningham & Garza, for appellants.
 Malcolm R. Wilkey, Asst. Atty. Gen., William B. Butler, U. S. Atty., Edgar O. Bottler, Sp. Asst. Atty. Gen., Houston, Tex., for appellee.
 Before TUTTLE, JONES and BROWN, Circuit Judges.
 TUTTLE, Circuit Judge.
 
 
 1
 Appellants were convicted of violating the United States Mail Fraud Statute, 18 U.S.C.A. § 1341.[1] This was the second trial under the indictment, the first having resulted in no convictions on any of the 20 counts, verdicts of acquittal as to two of the defendants on 19 out of 20 counts, verdicts of acquittal on several other counts as to several other defendants, and a mistrial as to the remaining defendants on all twenty counts. The 20th count was a conspiracy count.
 
 
 2
 This trial, vigorously contested, involving several weeks of testimony before the jury, produced 16 volumes of printed record, containing nearly 6,000 pages. The reiterated argument of counsel here that the record does not support the findings of the jury as to each of the defendants on each count included in the verdict has caused us to read carefully the extensive oral testimony in the case.
 
 
 3
 We can best state the case by briefly stating the facts upon which we conclude the jury could legally find all but two of the defendants guilty on counts 1-19. We shall thereafter discuss the legal points urged by appellants, some 30 in number.
 
 
 4
 Competent oral testimony and documentary evidence properly admitted on the trial would permit the jury to find the existence of the following scheme to defraud beginning in 1948 and concluding in 1954.
 
 
 5
 The Benevides Independent School District (hereafter B.I.S.D.) was a Texas school district that operated schools in the small Texas town of Benevides of several thousand population and in Freer, a town of approximately the same size. The population of Benevides was more than 90% of Latin derivation, whereas that of Freer was mostly "Anglo," as the saying goes in Duval county in which both towns, as well as Alice, the county seat, were situated. The Texas law provided for a board of seven trustees to run the district. Actually a majority of four of Latin derivation lived in Benevides and three "Anglos" lived in Freer, and the seven rarely met as a board. Each group ran its own school and prepared its own budget which, when combined under the direction of the Benevides group, resulted in the district budget on which tax assessments and collections were made. The office of the district was, until July 1, 1951, outside of the district in the Parr Building, in the town of San Diego, the home town of defendant, George B. Parr. Parr was the principal stockholder and president of the Texas State Bank of Alice, the official depository for the school district, so designated by the Texas school authorities, and he was also president and principal stockholder of the San Diego State Bank, San Diego, Texas.
 
 
 6
 Among the other defendants was a majority of the Benevides trustees, Octavio Saenz, the president of the board, Jesus G. Garza and Santiago Garcia. Defendant Oscar Carrillo, Sr. was secretary of the board and D. C. Chapa was the board-appointed Tax Assessor and Collector. He was the father of board member Oscar Carrillo and of defendant O. P. Carrillo, who became the paid lawyer for the board. The difference in names is accounted for from the fact that Mr. D. Carrillo Chapa took to the name Chapa, whereas his sons preferred Carrillo. The defendant Jesus Oliveira was a director of the Texas State Bank of Alice, and, though not a bona fide employee of B.I. S.D., the recipient of substantial board funds paid to him at the rate of $100 per month. Defendant B. F. Donald was the cashier of the Texas State Bank of Alice, of which Parr was president.
 
 
 7
 The day to day work of the school district office was done by a group consisting of one W. M. Benson, the auditor, (until July, 1950,) and Diego Heras, bookkeeper and "acting" secretary, and several women clerks. There were offices for George B. Parr, Chapa, and for Oscar Carrillo, Sr., the secretary. Although Parr was not a member of the Board, he attended the principal meetings of the board and completely dominated its activities. After July 1, 1950, he personally countersigned substantially all the Board checks. He also controlled the Texas State Bank at Alice, the Board's depository and the San Diego State Bank which cashed many Board checks without endorsement. Under the direction of defendant Parr, Heras or Benson frequently made out checks on the B.I.S.D. account payable to non-existent persons[2] and to actual payees for work that was not performed. These checks were signed at different times by Saenz, D. C. Chapa, Heras (he signed none after July, 1951) and Oscar Carrillo, Sr. (after July, 1951), and, until July, 1950, were countersigned by Benson and thereafter by George B. Parr. During the years involved such proven checks amount to approximately $190,000. Many of these checks were cashed at the Alice State Bank by or at the express direction of Donald, without endorsement of the payee, and the cash proceeds were delivered to Parr and occasionally to Chapa. Others of the fraudulent checks (those made out to names similar to the names of relatives of defendants) were cashed by the payee and still others were cashed by some of the defendants upon forged endorsements.
 
 
 8
 With the exception of Jesus Oliveira and O. P. Carrillo, who were convicted on the conspiracy count only, and whose cases will be separately discussed, each of the individual defendants participated directly in the preparation and negotiation of the fraudulent checks or was a substantial beneficiary from the practice, or both. Proof was introduced from which the jury could find that the two, Oliveira and Carrillo, were recipients of board money illegally.
 
 
 9
 The fraudulent scheme which the jury could find existed included the necessary steps of so keeping the board's records and so making its annual reports to the appropriate Texas school agency as to produce the board's annual share of state funds (approximately $140,000 per year) and included the necessary steps of assessing and collecting the taxes which the board had the legal power to levy. Thus enough money was collected to provide for the legitimate operation of the schools to the relative satisfaction of the school patrons, and enough additional was brought in to provide the funds to be looted.
 
 
 10
 An additional source of funds to the board tax assessor and collector Chapa, one of the most important figures in the scheme, was his billing of taxes to nonresident owners of mineral interests whose names did not appear on the tax rolls, and his personally cashing of the tax checks when received, at the San Diego State Bank, where the jury could believe his personal loans were credited with the proceeds.
 
 
 11
 The foregoing is the barest outline of the scheme which we have said the jury could find was concocted and participated in by all of the defendants, other than the two already mentioned, and of the evidence from which they also found that all were guilty of a conspiracy to do these acts. Counsel for the appellants, by the most vigorous cross examination of Diego Heras, sought to show that he too profited by the scheme and that his testimony was in conflict with earlier sworn statements and testimony. The jury could have believed both that Heras had feathered his own nest at the expense of the board[3] and that his testimony was far from trustworthy. The fact that he also participated in the scheme and was an important actor in carrying it out, if he was, did not, of course, prevent the jury from believing his testimony, much of which was corroborated by other testimony and circumstances.[4] Benson's testimony was also attacked by appellants, since he was the countersigner of most of the fraudulent checks prior to July 1, 1950. The court charged that Heras was an accomplice as a matter of law, and that the jury could find Benson an accomplice on the record.
 
 
 12
 Of course, the weight to be attributed to the witnesses' testimony on such a trial is exclusively for the jury. We conclude that the evidence fully warranted the jury's findings that this group of defendants did concoct a scheme to take over the operation of the Benevides Independent School District and operate the schools in such a manner as to enable them to siphon off from the school funds brought in by their false representations to the state and their illegal[5] assessments and levies against taxpayers in excess of $200,000 for themselves.
 
 
 13
 The gist of a mail fraud case is the placing or causing something to be placed in the mails or taking or causing something to be taken from the mails "for the purpose of executing such scheme * * *" The jury could believe that the nineteen different deposits in, or takings of mail from, the United States mail in the Houston Division of the Southern District of Texas, occurred as testified. We discuss below the legal question as to the causal relationship of the appellants and the persons who thus used the mails and also the issue of wilfulness in connection with causation.
 
 
 14
 Appellants contend here that such a scheme, if proved, does not vest jurisdiction in the Federal courts under the mail fraud statute. They say that this was a public body authorized and obligated by law to assess property in the District for taxation and levy taxes thereon for the legal operation of the schools. They say that the mailings in counts 1 through 16 "were all for the legal purpose of paying taxes, giving notices of hearings of the Board of Equalization, or furnishing information to taxpayers [actually sending tax bills.]" If, they say, funds so received in lawful payment of taxes were misappropriated after receipt, the most that the Government has shown is a series of embezzlements. As to the mailing in counts 17, 18 and 19, they say that the Conoco monthly statements and the B.I.S.D. checks in payment thereof would all have been sent in the legitimate conduct of the Board's business even in the absence of a scheme to defraud.
 
 
 15
 The appellants do not take the extreme position that elected officials cannot be found guilty of mail fraud growing out of their use of the mails pursuant to devising a scheme to use the public funds for their own purposes. In light of the decisions of this Court in Weiss v. United States, 5 Cir., 122 F.2d 675, certiorari denied, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550; Shushan v. United States, 5 Cir., 117 F.2d 110, 133 A.L.R. 1040, certiorari denied, 313 U.S. 574, 61 S.Ct. 1085, 85 L. Ed. 1531, and others, such a position would of course be untenable. But they do take the position that, assuming that public officials have taken charge of a school board for the purpose of defrauding it of the money that comes to it from state appropriations and from taxes, and assuming there is ample proof that the money is being taken continuously over the years, and notwithstanding proof that substantially all tax renditions are made by mail, there is a lack of proof that the mailing of the tax bills and the checks themselves were in furtherance of the scheme.
 
 
 16
 As pointed out by the government, this places them on the horns of a dilemma. By claiming that the mails are necessarily used in the lawful activities of B.I.S.D. they show that they must have contemplated that their fraudulent scheme of building up sufficient funds for the fraudulent purposes would necessarily involve the use of the mails and thus bring them within the rule stated in Pereira v. United States:
 
 
 17
 "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he `causes' the mails to be used. United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836." Pereira v. United States, 347 U.S. 1, 8-9, 74 S.Ct. 358, 363, 98 L.Ed. 435.
 
 
 18
 We conclude that there was ample proof that the use of the mails was in furtherance of the scheme.
 
 
 19
 There is no merit to appellant's contention that the proof in the case conclusively showed that use of the mails followed the execution of the scheme to defraud as was held by the Supreme Court to be the case in Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88. The evidence which could be accepted by the jury as true showed a continuing scheme to maintain control over the finances of B.I.S.D. to make possible the continued collection of state funds and taxes and the illegal use of part of these funds for the benefit of the conspirators. There was ample basis for the jury to find that the use of the mails was in furtherance of the scheme and not after it had been fully effectuated.
 
 
 20
 Turning now to the conviction on the 20th count, the conspiracy count, appellants do not contend that there was insufficient evidence to support the jury's verdict as to the conspiracy if it be assumed that there was ample evidence to support the findings on the first nineteen counts. Nor do they contend that, assuming that all the evidence properly admitted in proof of guilt of the other defendants on the first nineteen counts was also proper for consideration by the jury in testing the guilt of O. P. Carrillo and Jesus Oliveira under the conspiracy count, there was insufficient evidence to support the verdict against these two defendants on count 20.
 
 
 21
 This then causes us to consider the contention of appellants that the acquittal of these two defendants by a prior jury on all the nineteen substantive counts made improper the proof on this trial of their acts of illegally obtaining B.I.S.D. funds, which was charged as part of the nineteen counts.
 
 
 22
 The answer to this contention must be found in an understanding of the difference between an indictment for the doing of illegal acts on the one hand and an indictment for conspiring with others to do the same illegal acts on the other. It has long been held that an accused may be convicted and sentenced both for using the mails to defraud and for conspiring with others to use the mails to defraud, coupled with proof, of course, of the doing of a single act to effect the object of the conspiracy.
 
 
 23
 "* * * It is settled law in this country that the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, and a plea of double jeopardy is no defense to a conviction for both. See Pinkerton v. United States, 328 U.S. 640, 643-644, 66 S.Ct. 1180, 1181-1182, 90 L.Ed. 1489, and cases cited therein." Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435.
 
 
 24
 If, as is the case, an accused can be made legally to suffer two sentences, one for commission of the substantive offense and one for conspiring with others to commit the same offense, then an acquittal of the charge on the substantive offense does not prevent a conviction for conspiracy to commit that offense unless the proof required to convict on the substantive charges is identical with that required to convict on the conspiracy count. Pereira v. United States, supra. The exceptional case is Yawn v. United States, 5 Cir., 244 F.2d 235. In that case Yawn was charged with the offense of possessing an illegal still. He was also charged in a separate indictment with conspiracy to violate the liquor laws and one of the overt acts he was alleged to have committed to effect the conspiracy was that he possessed this same still. In the first trial the jury acquitted him of possessing the still. In the second trial the court admitted evidence of his possession of the still and permitted the issue to go to the jury as to whether he did possess the still as an act to effect the conspiracy. Although there were other overt acts alleged, the jury's finding of guilty on the conspiracy charge could have been based on a finding that he possessed the still, a fact which the jury had previously acquitted him on. We therefore reversed for a new trial.
 
 
 25
 It thus becomes necessary to determine here whether an acquittal of Carrillo and Oliveira of the substantive counts of this indictment is factually inconsistent with their subsequent conviction of the conspiracy charge. We think it quite clear that no such inconsistency exists.
 
 
 26
 To convict these two men on any of the substantive counts it was necessary that the Government prove that they participated in a plan to gain control over the school board, and that in pursuance of that plan they participated in the mailing of one or more of the letters specified in the nineteen counts. The jury may well have found an insufficiency of proof that they participated in the mailing of any of the items contained in the nineteen counts. The jury would thus be required to acquit them, as it did. In order for them to be convicted on the conspiracy count it would be necessary for the jury to find only that they, together with the other conspirators, conspired and agreed together to take over the affairs of the school board for the illegal purpose alleged and to use the mails in the 19 stated particulars, and that, having so conspired, they participated in the doing of at least one of the overt acts alleged in the conspiracy count. These acts were entirely different, as to these defendants, from those charged in the first nineteen counts, for the court charged that they could not be convicted on a finding that they had committed one of the overt acts as to which they had been acquitted. It is clear that the elements of proof required to warrant a conviction under count 20 are thus quite different from those required to sustain a conviction under the substantive counts of the indictment.
 
 
 27
 Appellants make a further contention that even those appellants who were still triable on all 20 counts were prejudiced by the introduction of evidence as to the illegal conduct of O. P. Carrillo and Oliveira because this portrayed to the jury illegal acts of persons who had been fully acquitted of complicity in these actions. This argument is based on the theory, which we have rejected above, that these two defendants could not legally be tried on count 20 following their acquittal on the substantive counts. Since we have rejected this contention it follows of course that there is no merit in the plea made on behalf of the other defendants. We conclude that neither res judicata, double jeopardy nor estoppel by judgment prevents the trial of these two defendants on count 20, notwithstanding their acquittal on counts 1 through 19, because, as we have already stated, the crime of conspiracy is a different crime and proof of its commission includes elements that were not resolved in favor of the accused on the earlier acquittal.
 
 
 28
 We next come to the contention variously urged by appellants, that the trial court permitted the conviction of appellants on an indictment which did not adequately charge wilfulness in the actions of the defendants and on a charge to the jury which did not accurately deal with the element of wilfulness.
 
 
 29
 The mail fraud statute provides that "whoever having devised or intended to devise any scheme or artifice to defraud * * * places in any post office * * any matter * * * or takes or receives therefrom any such matter * * shall be punished etc." The indictment in this case, after charging the alleged scheme or device, alleges that the "defendants for the purpose of executing the aforesaid scheme and artifice * * * caused to be taken from a post office," (emphasis added) or "caused to be placed in an authorized depository for mail matter," a letter, etc. Appellants argue that since the indictment does not expressly charge that the defendants took the letter from the post office or placed the letter in the authorized depository, but instead alleged that they caused the taking and the placing, the indictment is defective because it did not assert that these acts were "wilfully caused." It is their contention that since the Government did not charge that the defendants themselves did the act, the only way it could bring them within the terms of the criminal statute was by relying upon the provisions of 18 U.S.C.A. § 2(b). This section provides "whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal." Prior to the amendment of October 31, 1951, this section did not include the word "wilfully." As appellants point out, cases decided prior to that date do not deal with their contention here.
 
 
 30
 Appellants contend in effect that the omission of the word "wilfully" before the words "caused to be taken" and "caused to be placed" made the indictments defective. This same argument was advanced in the case of Londos v. United States, 5 Cir., 240 F.2d 1, 2, certiorari denied 353 U.S. 949, 77 S.Ct. 860, 1 L.Ed.2d 858. The accused persons in that case were charged with violating the statute, 18 U.S.C.A. § 2314, that says "whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered or counterfeited securities, knowing the same to have been falsely made * * * shall be * * * [punished]." The indictment in that case did not charge that Londos himself transported the fraudulent security. It charged rather that Londos "did with unlawful and fraudulent intent cause to be transported in foreign commerce etc. * * *." We said there "a simple allegation that appellants caused to be transported a `falsely made, forged, altered, or counterfeited' security in foreign commerce would not of course have been sufficient." But we then said:
 
 
 31
 "Even if it were necessary for the Government to allege its case within the terms of 18 U.S.C.A. § 2(b), the allegations that appellants unlawfully and fraudulently caused the transportation is a sufficient allegation that they willfully caused it."
 
 
 32
 So, too, as to the allegation that these defendants caused the letters to be taken from the post office "for the purpose of executing the aforesaid scheme and artifice." It is impossible to conceive of a person causing an act to be done for the purpose of executing a scheme or artifice as was charged in this indictment without its having been done wilfully. Purposefulness imports wilfulness. Wilfulness was adequately charged, sufficiently proved, and, we think, adequately discussed by the court in its charge to the jury. In fact the court expressly stated in its charge that the causing of the use of the mails by others must be shown to be wilful, and the court correctly defined the word "wilful."
 
 
 33
 The remaining substantial point raised by appellants that must be dealt with in light of the recently developed jurisprudence requiring disclosure to the defendant of written reports and statements made by Government witnesses as aids to impeachment is the contention that the court erred in not requiring the Government to deliver for the inspection of the accused persons a transcript of the grand jury proceedings so far as it disclosed testimony given by the witness Heras.
 
 
 34
 It was brought out on cross examination of Heras that he had made numerous written statements to investigating officers, some under oath, that he had testified several times before state and federal grand juries; that he had testified in open court in the previous trials, including the first trial, of this same case. Numerous inconsistencies and contradictions between his testimony on the current trial and his prior statements and testimony were inquired into by appellants' counsel during nearly a week of cross examination. Some inconsistencies and discrepancies were admitted by Heras, including an admission that he had sworn falsely in previous affidavits.
 
 
 35
 Appellants did not at any time request the trial court to make a preliminary inspection of the transcript to ascertain whether there was any inconsistency between Heras' testimony on the trial and his testimony before the grand jury. The trial court did not make such inspection. He merely denied the motion that it be made available to appellants on the ground of privilege and secrecy.
 
 
 36
 We think it quite clear that at the time this ruling was made the trial court's understanding of the law was justified by the decided cases. There is nothing in the Jencks case, Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, dealing with grand jury testimony and the statute subsequently enacted at 18 U.S.C.A. § 3500 does not deal with it.
 
 
 37
 The Federal Rule touching on the subject of secrecy of grand jury proceedings is 6(e) F.R.Cr.P., 18 U.S.C.A., which provides in material part:
 
 
 38
 "(e) Secrecy of Proceedings and Disclosure. Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for us in the performance of their duties. Otherwise a juror, attorney, interpreter or stenographer may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. * * *"
 
 
 39
 It is thus clear that the trial court has the express power in a proper case to order grand jury proceedings to be disclosed. It is uniformly stated that secrecy is the general rule and variations from it the exception. In the last pronouncement of the Supreme Court on the subject, the Court said in a civil case in which a party sought the right to inspect grand jury records:
 
 
 40
 "At the same time, we start with a long established policy that maintains the secrecy of the grand jury proceedings in the federal courts. See United States v. Johnson, 319 U.S. 503, 513, 63 S.Ct. 1233, 1238, 87 L.Ed. 1546; Costello v. United States, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397." United States v. Procter & Gamble, 356 U. S. 677, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077.[6]
 
 
 41
 All the cases cited here both by appellants and the United States expressly or impliedly accept this thesis. This, then, must mean that an exercise of discretion must determine whether in a particular case such order should issue. Whether in a particular case such order should issue, traditionally, of course, it is the trial judge whose discretion is involved. We have so held in United States v. Byoir, 5 Cir., 147 F.2d 336, 337.
 
 
 42
 It is clear that one of the exceptional cases in which the courts have usually held it appropriate to permit the inspection of limited parts of the grand jury testimony is one in which a defendant who is on trial for committing perjury in his grand jury testimony seeks to see the transcript of his entire testimony. Such instances are United States v. Rose, 3 Cir., 215 F.2d 617; Alu v. United States, 2 Cir., 246 F.2d 29; United States v. Remington, 2 Cir., 191 F.2d 246. This, of course, is not such a case.
 
 
 43
 The Court of Appeals for the Second Circuit has held that the proper procedure when such request is made for impeachment purposes is for the trial court to read the grand jury record touching the testimony in issue and determine whether there is a conflict, and if there is, to permit the defendant to use it for impeachment purposes. United States v. H. J. K. Theatre Co., 2 Cir., 236 F.2d 502. Even in such a case the court is permitted, in the exercise of a sound discretion to prevent merely cumulative impeachment, to limit such use, Id., at page 508.
 
 
 44
 As is the posture of this case, the Court of Appeals for the Fourth Circuit noted in Pittsburgh Plate Glass Company v. United States, 4 Cir., 260 F.2d 397, 404, that the defendant there had not moved for the court to inspect the grand jury minutes, and if there was a conflict to make them available to defendant. The court noted that counsel demanded access to the transcript as a matter of right. That is the only motion made in the case before us. That court affirmed the trial court's refusal to make the transcript available. The court said:
 
 
 45
 "After all, what we are dealing with is a problem of the fair scope of cross-examination, and the sound judicial discretion of the trial judge must be the chief guide. When the subject matter is one as delicate as grand jury testimony, no fixed rule can be formulated. The Judge should not be compelled to inspect in all cases; neither should he indiscriminately refuse, but he should exercise his judgment according to the circumstances. Certainly we could not approve any rule, such as contended for by the defendants here, requiring the automatic delivery of grand jury transcripts to defendants on demand."
 
 
 46
 This case and the companion case, Galax Mirror Co., Inc. v. United States, are now before the Supreme Court for review, certiorari having been heretofore granted, 358 U.S. 918, 79 S.Ct. 290, 3 L.Ed.2d 237.
 
 
 47
 We think, however, that there was ample basis on the record before us here to warrant the trial court's refusal to grant the order even though on the record in the Pittsburgh Plate Glass Co. case the Supreme Court should find it was error to refuse the request. This assumes, of course, that the Court will not decide that in every case the defendant has the unqualified right to inspect the grand jury records and that there is no longer any discretion vested in the trial judge thereabout.
 
 
 48
 The defendant's counsel cross examined witness Heras, whose grand jury testimony was requested, for five days. On the basis of prior statements furnished by government counsel under the Jencks rule and prior sworn testimony of Heras in earlier trials, counsel demonstrated to the satisfaction of the Court that Heras was an accomplice in the alleged offenses. The Court so charged the jury. Counsel also demonstrated numerous inconsistencies in Heras' testimony and prior statements, and drew from him a concession that he had sworn falsely in a statement to the investigating agents. It may well be that the trial court considered that any additional inconsistent testimony that the grand jury transcript might show Heras had given would be merely cumulative in the same way the court thought the testimony would be cumulative in H. J. K. Theatre Co., supra.
 
 
 49
 Moreover, defendants largely pitched their defense on the basis of this being a fight between two political factions, implying that Heras was either personally, or as a tool for others, interested in sending the defendants, especially Parr, to jail in order to get him out of local politics. The evidence permitted the inference that the so-called Parr faction or party was an extremely powerful influence in the county. There was also evidence from which the jury was permitted to find that evidence material to the case had been taken from the Parr dominated banks and destroyed by some of the defendants. One of the grounds of this appeal is that the indictments were defective and should be dismissed. So far as was apparent to the trial court it was not unlikely that Heras might again be called upon to testify before a grand jury inquiring into these same general allegations. This could certainly follow if we were to sustain appellant's attack on the present indictment. The court could well have apprehended that if the evidence introduced in this trial was believed by the jury, the free, untrammeled testimony of Heras might be made unavailable on any subsequent grand jury investigation, if his testimony before the grand jury should be subjected to the defendants' scrutiny.
 
 
 50
 Under all of these circumstances we think it quite clear that the generally recognized reasons for secrecy in grand jury proceedings, as mentioned with approval by the Supreme Court in United States v. Procter & Gamble, supra,[7] apply with vigor in this case. At least we conclude that the trial court's denial of the motion on the grounds of privilege and secrecy was not an abuse of his discretion.
 
 
 51
 We have carefully considered appellants' other asserted grounds for reversal. We think that none of the asserted grounds, either failures to charge, denial of requested charges, the charge given, the refusal to grant a mistrial, constitute reversible error. Rulings of the court on the sufficiency of the indictment and other preliminary matters were not erroneous. From a reading of the record, it is amply apparent that during the course of this trial, lasting some six weeks, the issues were clearly and fairly presented to the jury.
 
 
 52
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 "§ 1341. Frauds and swindles
 "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C.A. § 1341.
 
 
 [2]
 The interchangeability of the family names of persons of Latin descent made such manipulation hard for an outsider to detect
 
 
 [3]
 He admitted receiving large amounts of cash which he claimed represented "advances" of his salary or expense allowance. It was not disputed, however, that these "advances" greatly exceeded the salary in a given period and were never paid back in any substantial amount. It was also proved by Heras and Benson that much of this money was advanced on Parr's authority
 
 
 [4]
 All but 23 cancelled B.I.S.D. checks for the actual period were destroyed or missing. Heras kept possession of 20 of these. The microfilm records of all transactions in the two Parr controlled banks mysteriously "disappeared" immediately following the start of the investigation by Federal authorities
 
 
 [5]
 The jury could find them to have been illegal because they were fixed in amount by the desire to build up the collections beyond the legal needs for operation
 
 
 [6]
 To be sure the Court also said: "We do not reach in this case problems concerning the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like [citing United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, and Cf. Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007.] Those are cases of particularized need when the secrecy of the proceedings is lifted discreetly and limitedly."
 
 
 [7]
 The Court said in footnote 6, 356 U.S. at page 681, 78 S.Ct. at page 986:
 "In United States v. Rose, 3 Cir., 215 F.2d 617, 628-629, those reasons were summarized as follows:
 "(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."