**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.

MICHAEL LEWIS CLARK,
  *Defendant-Appellant.*

No. 04-30249

D.C. No.
CR-03-00406-L

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
June 6, 2005—Seattle, Washington

Filed January 25, 2006

Before: Procter Hug, Jr., Warren J. Ferguson, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge Ferguson

999

## COUNSEL

Michael Filipovic, Assistant Federal Public Defender, Seattle, Washington, for the defendant-appellant.

John McKay, United States Attorney, Seattle, Washington; Helen J. Brunner, Assistant United States Attorney, Seattle, Washington; John J. Lulejian, Assistant United States Attorney, Seattle, Washington; Susan B. Dohrmann, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

## OPINION

McKEOWN, Circuit Judge:

In this appeal we are confronted with a question of first impression regarding the scope of Congress's power under the Foreign Commerce Clause.[1] At issue is whether Congress

---

[1]We commend both counsel for their excellent and comprehensive briefing on this novel issue.

exceeded its authority "to regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, in enacting a statute that makes it a felony for any U.S. citizen who travels in "foreign commerce," i.e. to a foreign country, to then engage in an illegal commercial sex act with a minor. 18 U.S.C. § 2423(c). We hold that Congress acted within the bounds of its constitutional authority.

Congressional invocation of the Foreign Commerce Clause comes as no surprise in light of growing concern about U.S. citizens traveling abroad who engage in sex acts with children. The United States reiterated its commitment to quelling sexual abuse abroad by signing The Yokohama Global Commitment 2001, available at http://www.unicef.org/events/yokohama/outcome.html (last visited Dec. 29, 2005), which was concluded at the Second World Congress Against the Commercial Sexual Exploitation of Children. The Commitment welcomes "new laws to criminalize [child prostitution], including provisions with extra-territorial effect." *Id.* Notably, in an explanatory statement attached to the Commitment, the United States emphasized that it "believes that the Optional Protocol [on child prostitution] and [the International Labour Organization's Convention No. 182 regarding child labor] provide a clear starting point for international action concerning the elimination of commercial sexual exploitation of children." *Id.*

Under the Commerce Clause, Congress has power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." This seemingly simple grant of authority has been the source of much dispute, although very little of the controversy surrounds the "foreign Nations" prong of the clause. Cases involving the reach of the Foreign Commerce Clause vis-a-vis congressional authority to regulate our citizens' conduct abroad are few and far between. *See, e.g.*, *United States v. Bredimus*, 352 F.3d 200, 207-08 (5th Cir. 2003) (affirming conviction under 18 U.S.C. § 2423(b), which reaches any person who travels in foreign

commerce "for the purpose of" engaging in illicit sexual conduct).[2] It is not so much that the contours of the Foreign Commerce Clause are crystal clear, but rather that their scope has yet to be subjected to judicial scrutiny.

The Supreme Court has long adhered to a framework for domestic commerce comprised of "three general categories of regulation in which Congress is authorized to engage under its commerce power," *Gonzales v. Raich*, 125 S. Ct. 2195, 2205 (2005): (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *See also United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *Raich*, 125 S. Ct. at 2215 (Scalia, J., concurring) (noting that for over thirty years, "our cases have mechanically recited that the Commerce Clause permits congressional regulation of three categories"). This framework developed in response to the unique federalism concerns that define congressional authority in the interstate context. *Lopez*, 514 U.S. at 557 ("[T]he scope of the interstate commerce power 'must be considered in the light of our dual system of government . . . .' ") (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). No analogous framework exists for foreign commerce.

Further distinguishing the two spheres "is evidence that the Founders intended the scope of the foreign commerce power to be . . . greater" as compared with interstate commerce. *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979). This expansive latitude given to Congress over foreign commerce is sensible given that "Congress' power to regulate interstate commerce may be restricted by considerations of federalism and state sovereignty," whereas "[i]t has

---

[2]As discussed in § IV(A), the cases arise primarily under the dormant Foreign Commerce Clause and invoke the interplay between state and federal authority.

never been suggested that Congress' power to regulate foreign commerce could be so limited." *Id.* at 448 n.13.

Adapting the interstate commerce categories to foreign commerce in specific contexts is not an insurmountable task. *See, e.g.*, *United States v. Cummings*, 281 F.3d 1046, 1049 n.1 (9th Cir. 2002) (analyzing constitutionality of the International Parental Kidnaping Act, 18 U.S.C. § 1204(a), under *Lopez*'s three-category approach). At times, however, this undertaking can feel like jamming a square peg into a round hole. Instead of slavishly marching down the path of grafting the interstate commerce framework onto foreign commerce, we step back and take a global, commonsense approach to the circumstance presented here: The illicit sexual conduct reached by the statute expressly includes commercial sex acts performed by a U.S. citizen on foreign soil. This conduct might be immoral and criminal, but it is also commercial. Where, as in this appeal, the defendant travels in foreign commerce to a foreign country and offers to pay a child to engage in sex acts, his conduct falls under the broad umbrella of foreign commerce and consequently within congressional authority under the Foreign Commerce Clause.

## BACKGROUND

Michael Lewis Clark, a seventy-one year old U.S. citizen and military veteran, primarily resided in Cambodia from 1998 until his extradition in 2003. He typically took annual trips back to the United States and he also maintained real estate, bank accounts, investment accounts, a driver's license, and a mailing address in this country. Following a family visit in May 2003, Clark left Seattle and flew to Cambodia via Japan, Thailand, and Malaysia. He was traveling on a business visa that he renewed on an annual basis.

While in Cambodia, Clark came to the attention of Action Pour Les Enfants, a non-governmental organization whose mission is to rescue minor boys who have been sexually

molested by non-Cambodians. Clark came under suspicion when street kids reported to social workers that he was molesting young boys on a regular basis. The organization in turn reported him to the Cambodian National Police. In late June 2003, the Cambodian police arrested Clark after discovering him in a Phnom Penh guesthouse engaging in sex acts with two boys who were approximately ten and thirteen years old. He was charged with debauchery. The United States government received permission from the Cambodian government to take jurisdiction over Clark.

U.S. officials—assisted by the Cambodian National Police and the Australian Federal Police—conducted an investigation that led to Clark's confession and extradition to the United States. As part of the investigation, the younger boy told authorities that he had engaged in sex acts with Clark because he needed money to buy food for his brother and sister. The older boy stated that Clark had hired him in the past to perform sex acts, on one occasion paying five dollars. Other young boys whom Clark had molested reported that they were paid about two dollars, and Clark stated that he routinely paid this amount. Clark acknowledged that he had been a pedophile since at least 1996, "maybe longer," and had been involved in sexual activity with approximately 40-50 children since he began traveling in 1996.

Upon his return to the United States, Clark was indicted under the provisions of the newly-enacted Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, 117 Stat. 650 (2003).[3] He pled guilty to two counts under 18

---

[3]Although Clark was reportedly the first person charged under the PROTECT Act's extraterritorial provisions, *see* Blaine Harden, *Veteran Indicted on Sex Charges; Man Is First Charged Under Protect Law's Provision on Tourism*, Wash. Post at A5 (Sept. 25, 2003), the U.S. Immigration and Customs Enforcement's "Operation Predator" reports that thirteen arrests had been made as of July 19, 2005, http://www.ice.gov/graphics/news/factsheets/statistics.htm (last visited Dec. 29, 2005).

U.S.C. § 2423(c) and (e)[4] but reserved the right to appeal his pre-trial motion to dismiss based on constitutional, jurisdictional, and statutory construction grounds. *See United States v. Clark*, 315 F. Supp. 2d 1127 (W.D. Wash. 2004) (order denying Clark's motion to dismiss).

On appeal, Clark's challenge centers on the constitutionality of § 2423(c). Adopted in 2003 as part of the PROTECT Act, § 2423(c) provides as follows:

> (c) Engaging in illicit sexual conduct in foreign places. Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

This provision was first proposed as part of the Sex Tourism Prohibition Improvement Act of 2002, H.R. Rep. No. 107-525 (2002). The "Constitutional Authority Statement" in the Report accompanying this Act expressly identified the Commerce Clause, article I, section 8 of the Constitution, as the authority for the legislation. *Id.* at 5. The purpose of the bill was "to make it a crime for a U.S. citizen to travel to another country and engage in illicit sexual conduct with minors." *Id.* The provision was not enacted, however, until it was added to the PROTECT Act the following year. *See* H.R. Rep. No. 108-66, at 5 (2003) (Conf. Rep.), *as reprinted in* 2003 U.S.C.C.A.N. 683. This section was incorporated verbatim into the 2003 legislation but the Report on the PROTECT Act does not include the prior reference to constitutional authority.

Before the PROTECT Act became law in 2003, § 2423(b)

---

[4]Subsection (e) provides that an attempt or conspiracy to violate § 2423(c) shall be punishable in the same manner as a completed violation.

required the government to prove that the defendant "travel-[ed] in foreign commerce, or conspire[d] to do so, for the *purpose of engaging in*" specified sexual conduct with a person under eighteen years of age. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1796, Sec. 160001 (1994) (codified as amended at 18 U.S.C. § 2423(b)) (emphasis added). The PROTECT Act replaced this single section with new subsections (b) through (g), with the new subsection (b) remaining substantively the same as the former subsection (b). Subsection (c) is an entirely new section which deletes the "for the purpose of" language.[5] The conference report accompanying the PROTECT Act explains that Congress removed the intent requirement from § 2423(c) so that "the government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country." H.R. Rep. No. 108-66 at 51; *see also* H.R. Rep. No. 107-525, at 2 (same statement in report for failed 2002 bill). Consequently, for § 2423(c) to apply, the two key determinations are whether the defendant "travel[ed] in foreign commerce" and "engages in any illicit sexual conduct."

The statute defines "illicit sexual conduct" in two ways: First, the definition includes "a sexual act (as defined in section 2246 [18 U.S.C. § 2246]) with a person under 18 years of age that would be in violation of chapter 109A [18 U.S.C. §§ 2241 et seq.] if the sexual act occurred in the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 2423(f)(1). Chapter 109A, in turn, criminalizes various forms of sexual abuse including, for example, aggravated sexual abuse by force, threat, or other means, 18 U.S.C.

---

[5]Subsection (d) covers persons who provide ancillary services to facilitate travel "for the purpose of" engaging in illegal acts; subsection (e) covers attempt and conspiracy; subsection (f) cross-references the definition of "illegal sexual conduct" with other statutes; and subsection (g) provides a defense where the defendant in a commercial sex act case reasonably believed that the person was 18 years old. 18 U.S.C. § 2423(d)-(g).

§ 2241(a)-(b); sexual abuse by threatening or placing that other person in fear, 18 U.S.C. § 2242; and sexual abuse of a minor or ward, 18 U.S.C. § 2243. These violations share the common characteristic that there is no economic component to the crime. In other words, they are non-commercial sex acts.

In contrast, the second prong of the definition covers "any commercial sex act (as defined in section 1591 [18 U.S.C. § 1591]) with a person under 18 years of age." 18 U.S.C. § 2423(f)(2). "Commercial sex act," in turn, is defined as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(c)(1). Clark acknowledges that his conduct qualifies as illicit sexual conduct, and he admitted in his plea agreement that he "intended to pay each of the boys and each of the boys expected such payment in exchange for the sexual encounter." Accordingly, it is this second "commercial sex act" prong that is at issue in Clark's appeal.

## ANALYSIS

Clark does not dispute that he traveled in "foreign commerce," nor does he dispute that he engaged in illicit commercial sexual conduct. The challenge he raises is to congressional authority to regulate this conduct. In addition to his Commerce Clause challenge, Clark attacks his conviction on international law, statutory construction, and Due Process grounds.[6] In recognition of the principle that courts have a "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration," *County Court of Ulster County v. Allen*, 442 U.S. 140, 154 (1979), we begin our analysis with Clark's non-constitutional claims.

---

[6]Clark initially raised issues related to his sentence but has since withdrawn this aspect of his appeal.

**I. SECTION 2423(C) COMPORTS WITH THE PRINCIPLES OF INTERNATIONAL LAW**

We start with Clark's argument that extraterritorial application of § 2423(c) violates principles of international law.[7] On de novo review, *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1203-04 (9th Cir. 1991), we hold that extraterritorial application is proper based on the nationality principle.

[1] The legal presumption that Congress ordinarily intends federal statutes to have only domestic application, *see Small v. United States*, 125 S. Ct. 1752, 1755 (2005), is easily overcome in Clark's case because the text of § 2423(c) is explicit as to its application outside the United States. *See* 18 U.S.C. § 2423(c) (titled "Engaging in illicit sexual conduct in foreign places" and reaching people "who travel[ ] in foreign commerce"); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 176 (1993) (explaining that there must be "affirmative evidence of intended extraterritorial application"). By its terms, the provision is exclusively targeted at extraterritorial conduct.

[2] Having addressed this threshold issue, we ask whether the exercise of extraterritorial jurisdiction in this case comports with principles of international law. *See United States v.*

---

[7]Clark's challenge is distinct from the more common scenario where a party challenges only the extraterritorial reach of a statute without contesting congressional authority to enact the statute. *See, e.g.*, *Small v. United States*, 125 S. Ct. 1752, 1754 (2005) (holding that the phrase "convicted in any court" in a statute criminalizing firearm possession by a convicted felon, 18 U.S.C. § 922(g)(1), does not apply to extraterritorial convictions); *Timberlane Lumber Co. v. Bank of Am.*, 549 F.2d 597, 608-15 (9th Cir. 1976) (discussing the extraterritorial reach of U.S. antitrust laws to activities in foreign countries), *superseded by statute as stated in McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 813 n.8 (9th Cir. 1988); *United States v. Cotten*, 471 F.2d 744, 750 (9th Cir. 1973) (holding that a statute proscribing theft of government property applied extraterritorially, and that the "law certainly represents an exercise by the Government of its right to defend itself from obstructions and frauds").

*Vasquez-Velasco*, 15 F.3d 833, 839 (9th Cir. 1994) ("In determining whether a statute applies extraterritorially, we also presume that Congress does not intend to violate principles of international law.") (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21-22 (1963)); *see also United States v. Neil*, 312 F.3d 419, 421 (9th Cir. 2002). Of the five general principles that permit extraterritorial criminal jurisdiction,[8] the nationality principle most clearly applies to Clark's case. The nationality principle "permits a country to apply its statutes to extraterritorial acts of its own nationals." *United States v. Hill*, 279 F.3d 731, 740 (9th Cir. 2002). Jurisdiction based solely on the defendant's status as a U.S. citizen is firmly established by our precedent. *See, e.g.*, *United States v. Walczak*, 783 F.2d 852, 854 (9th Cir. 1986) (holding that jurisdiction over a U.S. citizen who violated a federal statute while in Canada was proper under the nationality principle); *McKeel v. Islamic Repub. of Iran*, 722 F.2d 582, 588 (9th Cir. 1983) (noting that nationality principle permits states to punish the wrongful conduct of its citizens); *United States v. King*, 552 F.2d 833, 851 (9th Cir. 1976) (commenting that nationality principle would apply to U.S. citizen defendants). Clark's U.S. citizenship is uncontested.[9] Accordingly, extraterritorial application of § 2423(c) to Clark's conduct is proper based on the nationality principle.[10]

---

[8]The five jurisdictional bases are territorial, national, protective, universal, and passive personality. *See* Restatement (Third) of Foreign Relations Law of the United States § 402 (1987); *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002) (listing the five principles).

[9]Because Clark is a U.S. citizen, we do not reach the issue whether reliance on the nationality principle is also proper when "alien[s] admitted for permanent residence" are prosecuted under § 2423(c). 18 U.S.C. § 2423(c).

[10]Although the district court found that extraterritorial jurisdiction was proper under both the nationality principle and universality principle, *Clark*, 315 F. Supp. 2d at 1131, we decline to address whether the universality principle also applies in Clark's case because extraterritorial application of a criminal law need be justified by only one of the five principles of extraterritorial authority. *See Chua Han Mow v. United States*, 730 F.2d 1308, 1312 (9th Cir. 1984).

Clark also seeks to invalidate the statute because, in his view, extraterritorial application is unreasonable. *See* Restatement (Third) of Foreign Relations Law of the United States § 403 (1987); *Vasquez-Velasco*, 15 F.3d at 840-41 (holding that extraterritorial application of U.S. statute to violent crimes associated with drug trafficking was reasonable under international law). The record provides no support for this argument. Clark cites no precedent in which extraterritorial application was found unreasonable in a similar situation. Cambodia consented to the United States taking jurisdiction and nothing suggests that Cambodia objected in any way to Clark's extradition and trial under U.S. law. Clark himself stated to a U.S. official in Cambodia that he "wanted to return to the United States" because he saw people dying in the Cambodian prison "and was very much afraid that if [he] stayed in that prison, [he] would not survive." Having been saved from immediate prosecution in Cambodia, it is somewhat ironic that he now challenges the law in a United States court.

## II. CLARK'S CONDUCT FALLS WITHIN THE SCOPE OF § 2423(C)

Clark posits that § 2423(c) can be saved from constitutional scrutiny by interpreting it to require that the illicit sexual conduct take place while the defendant is literally still traveling. The district court declined to dismiss the indictment on this ground, explaining that "Clark is attempting to add elements to the crime . . . that simply do not exist in the statute." *Clark*, 315 F. Supp. 2d at 1130. We agree. Despite Clark's efforts to distance himself from the statute, we are unable to resolve this appeal by excising Clark's conduct from the reach of § 2423(c). *Cf. Jones v. United States*, 529 U.S. 848, 850-51 (2000) (avoiding constitutional challenge by construing statute's text to hold that certain owner-occupied residences do not qualify as property "used in" commerce).

The statute is plain on its face: Section 2423(c) reaches "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person." It does not require that the conduct occur *while* traveling in foreign commerce. In Clark's case, the lapse in time between his most recent transit between the United States and Cambodia and his arrest was less than two months. We see no plausible reading of the statute that would exclude its application to Clark's conduct because of this limited gap.[11] Because the statute is unambiguous and Clark's conduct falls squarely within the class of persons whose conduct Congress intended to criminalize under this statute, we do not invoke the rule of lenity. *Jones*, 529 U.S. at 858 ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity") (citation omitted).

The legislative history also supports the plain reading that we adopt. The conference report explains that Congress eliminated the intent requirement so that "the government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country." H.R. Rep. No. 108-66 at 51. From a practical perspective, it seems nonsensical for Congress to limit the scope of § 2423(c) to the unlikely scenario where the abuse occurs while the perpetrator is literally en route. This reading would eviscerate § 2423(c) by severely limiting its use to only those people who commit the offense while physically onboard an international flight, cruise, or other mode of transportation. We decline to adopt Clark's strained reading of the statute.

## III.   NO DUE PROCESS VIOLATION

The next question is whether extraterritorial application of

---

[11]Whether a longer gap between the travel and the commercial sex act could trigger constitutional or other concerns is an issue we leave for another day.

§ 2423(c) violates the Due Process Clause of the Fifth Amendment because there is an insufficient nexus between Clark's conduct and the United States. We hold that, based on Clark's U.S. citizenship, application of § 2423(c) to his extraterritorial conduct is neither "arbitrary [n]or fundamentally unfair." *United States v. Davis*, 905 F.2d 245, 249 (9th Cir. 1990).[12]

**[3]** Clark is correct that to comply with the Due Process Clause of the Fifth Amendment, extraterritorial application of federal criminal statutes requires the government to demonstrate a sufficient nexus between the defendant and the United States "so that such application would not be arbitrary or fundamentally unfair." *Davis*, 905 F.2d at 248-49. Indeed, "even resort to the Commerce Clause can[not] defy the standards of due process." *Sec'y of Agric. v. Cent. Roig Refining Co.*, 338 U.S. 604, 616 (1950).

**[4]** In *Blackmer v. United States*, 284 U.S. 421 (1932), the Supreme Court explained that the extraterritorial application of U.S. law to its citizens abroad did not violate the Fifth Amendment. The Court declared that despite moving his residence to France, the U.S.-citizen defendant "continued to owe allegiance to the United States. By virtue of the obligations of citizenship, the United States retained its authority over him, and he was bound by its laws made applicable to him in a foreign country." *Id.* at 436. This longstanding principle that citizenship alone is sufficient to satisfy Due Process concerns still has force. Citing *Blackmer*, we recently affirmed that "[t]here is no doubt that the United States may exercise jurisdiction over American nationals living abroad, regardless of where the crime is committed." *United States v. Corey*, 232 F.3d 1166, 1179 n.9 (9th Cir. 2000).

---

[12]Although Clark's citizenship alone is sufficient to satisfy Due Process concerns, his U.S. investments, ongoing receipt of federal retirement benefits and use of U.S. military flights also underscore his multiple and continuing ties with this country.

Clark offers no authority that calls into question this principle. Instead, he relies on cases that involved *foreign* nationals, which meant that the courts had no choice but to look beyond nationality to establish the defendants' ties with the United States. *See, e.g.*, *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1254 (9th Cir. 1998) (defendant and crew "were all Columbians"); *Davis*, 905 F.2d at 247 ("Davis is not a citizen of the United States.").

**[5]** Clark is a U.S. citizen, a bond that "implies a duty of allegiance on the part of the member and a duty of protection on the part of the society. These are reciprocal obligations, one being a compensation for the other." *Luria v. United States*, 231 U.S. 9, 22 (1913). Predicated on this imputed allegiance, application of § 2423(c) to Clark's extraterritorial conduct does not violate the Due Process Clause.[13] Having concluded that none of Clark's other arguments resolve this appeal, we turn to Clark's Commerce Clause challenge.

## IV. Congress's Foreign Commerce Clause Power Extends to Regulating Commercial Sex Acts Abroad

In considering whether Congress exceeded its power under the Foreign Commerce Clause in enacting § 2423(c), we

---

[13]Clark also raises notice and vagueness challenges, neither of which withstands scrutiny. Section 2423(c) was enacted in April 2003—while Clark was visiting the United States—and the commercial sex act did not occur until June 2003. Mere "ignorance of the law will not excuse." *Shevlin-Carpenter Co. v. Minn.*, 218 U.S. 57, 68 (1910). Clark might have been ignorant of the law, but he had constitutionally sufficient notice. We are not persuaded by Clark's argument that the statute's "travels in foreign commerce" language gave him "no reasonable basis" to anticipate being haled into a U.S. court. For a criminal statute to survive a vagueness challenge, we require only that "a reasonable person of ordinary intelligence would understand what conduct the statute prohibits." *United States v. Lee*, 183 F.3d 1029, 1032 (9th Cir. 1999). A reasonable person would easily understand § 2423(c) to cover Clark's travel to Cambodia and sexual conduct with minors there.

ground our analysis in the fundamental principle that "[i]t is an essential attribute of [Congress's power over foreign commerce] that it is exclusive and plenary." *Bd. of Trustees of Univ. of Ill. v. United States*, 289 U.S. 48, 56 (1933). We are further mindful of the Supreme Court's caution that "[d]ue respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). No plain showing has been made here. In light of Congress's sweeping powers over foreign commerce, we conclude that Congress acted within its constitutional bounds in criminalizing commercial sex acts committed by U.S. citizens who travel abroad in foreign commerce.[14]

---

[14]Our review of the constitutionality of § 2423(c) is focused on congressional authority under the Commerce Clause. As pointed out by the Government, the Supreme Court once remarked in a case involving the delegation of legislative power to the Executive that "[t]he broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315-16 (1936). Standing alone, however, this reference does not establish that the Foreign Commerce Clause has no meaning or is without bounds. Nor does it necessarily mean that congressional regulation of external affairs has no limits. The Government has not argued—nor is there any indication in the legislation—that Congress enacted § 2423(c) based on an implied foreign affairs power. *Cf. United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1077 (9th Cir. 1998) (noting that in exercising immigration power, which falls into the arena of foreign affairs, "Congress is not subject to the rigid constraints that govern its authority in domestic contexts"). Nonetheless, given our charge to uphold the statute absent a plain showing that it is unconstitutional, *United States v. Morrison*, 529 U.S. 598, 607 (2000), we acknowledge that Congress's plenary authority over foreign affairs may also provide a sufficient basis for § 2423(c). *See, e.g., Curtiss-Wright Export Corp.*, 299 U.S. at 315; *United States v. Belmont*, 301 U.S. 324, 331 (1937) ("[C]omplete power over international affairs is in the national government . . .").

At the outset, we highlight that § 2423(c) contemplates two types of "illicit sexual conduct": non-commercial and commercial. Clark's conduct falls squarely under the second prong of the definition, which criminalizes "any commercial sex act . . . with a person under 18 years of age." 18 U.S.C. § 2423(f)(2).[15] In view of this factual posture, we abide by the rule that courts have a "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration," *County Court of Ulster County*, 442 U.S. at 154, and limit our holding to § 2423(c)'s regulation of commercial sex acts.[16]

---

[15]That the authorities arrested Clark before the money had actually changed hands is immaterial to our analysis. Clark does not dispute that he hired the boys to engage in sex acts with the promise of monetary payment, and the statute does not require that the victims be paid by the defendant prior to arrest. *See* 18 U.S.C. § 2423(e) (providing that an attempt to violate § 2423(c) shall be punishable in the same manner as a completed violation). In fact, the second count to which Clark pled guilty was that he traveled in foreign commerce and "thereafter attempted to engage in illicit sexual conduct."

[16]We do not decide the constitutionality of § 2423(c) with respect to illicit sexual conduct covered by the non-commercial prong of the statute, such as sex acts accomplished by use of force or threat. *See* 18 U.S.C. § 2423(f) (defining "illicit sexual conduct" in part by reference to crimes listed under 18 U.S.C. §§ 2241 et seq.). The situation presented by § 2423(c) is distinct from challenges in which courts have carved out a discrete subset of conduct from a statute based on distinctions deduced from the statutory scheme. *See, e.g.*, *Raich*, 125 S. Ct. at 2211 (disagreeing with this court's isolation of a "separate and distinct" class of activities beyond the reach of the federal statute and instead concluding that the subdivided class "was an essential part of the larger regulatory scheme"); *United States v. McCoy*, 323 F.3d 1114, 1115 (9th Cir. 2003) (holding a statute unconstitutional as applied to the limited category of simple intrastate possession of child pornography that had not traveled in interstate commerce). Here, the statute is plain on its face in dividing the definition of "illicit sexual conduct" into two distinct, numbered prongs. We address only the prong that applies to Clark's conduct. This decision to limit our holding to commercial sex acts is an expression of judicial restraint, not an attempt to atomize a cohesive statutory scheme.

### A. THE COMMERCE CLAUSE: STRUCTURE AND HISTORY

Chief Justice Marshall observed long ago that "[t]he objects, to which the power of regulating commerce might be directed, are divided into three distinct classes—foreign nations, the several states, and Indian Tribes. When forming this article, the convention considered them as entirely distinct." *Cherokee Nation v. Georgia*, 30 U.S. 1, 18 (1831). Looking to the text, the single clause indeed embodies three subclauses for which distinct prepositional language is used: "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

Among legal scholars there has been considerable debate over the intrasentence unity—or disunity, as the case may be —of the three subclauses, considering that they share the common language "[t]o regulate Commerce." Some commentators take the view that Congress's powers over commerce with foreign nations and Indian tribes are broader than over interstate commerce. *See, e.g.*, Kenneth M. Casebeer, *The Power to Regulate "Commerce with Foreign Nations" in a Global Economy and the Future of American Democracy: An Essay*, 56 U. Miami L. Rev. 25, 33-41 (2001); 1 R. Rotunda & J. Nowak, *Treatise on Constitutional Law* § 4.2 (3d ed. 1999) ("Even during periods when the Justices were debating whether to significantly restrict the congressional power to regulate intrastate activities under the commerce power, there was no serious advocacy of restrictions on the federal powers in these other areas.").

Other scholars maintain that Congress has coextensive powers under the Commerce Clause's subdivisions. *See e.g.*, Louis Henkin, *Foreign Affairs and the Constitution* 70 n.9 (1972) ("It is generally accepted, however, that the power of Congress is the same as regards both [foreign and interstate commerce."); Saikrishna Prakash, *Our Three Commerce Clauses and the Presumption of Intrasentence Uniformity*, 55

Ark. L. Rev. 1149, 1173 (2003) ("In practice, we have three different Commerce Clauses when text and history indicate that we ought to have but one."). Despite the long-running lively debate among scholars, no definitive view emerges regarding the relationship among the three subclauses. Nonetheless, Supreme Court precedent points to the conclusion that the Foreign Commerce Clause *is* different than the Interstate Commerce Clause. *See Japan Line*, 441 U.S. at 448 ("[T]here is evidence that the Founders intended the scope of the foreign commerce power to be . . . greater" as compared with interstate commerce.).

Regardless of how separate the three subclauses may be in theory, the reality is that they have been subject to markedly divergent treatment by the courts. This approach is not surprising given the considerably different interests at stake when Congress regulates in the various arenas. Most notably, regardless of whether the subject matter is drugs, gender-motivated violence, or gun possession, a prominent theme runs throughout the interstate commerce cases: concern for state sovereignty and federalism. On the other hand, "[t]he principle of duality in our system of government does not touch the authority of the Congress in the regulation of foreign commerce." *Bd. of Trustees of Univ. of Ill.*, 289 U.S. at 57. This distinction provides a crucial touchstone in applying the Foreign Commerce Clause, for which Congress's authority to regulate has not been defined with the precision set forth by *Lopez* and *Morrison* in the interstate context.

We start with the component that has dominated judicial consideration of the Commerce Clause: "among the several States." After decades of expansive reading by the courts, *see, e.g.*, *Katzenbach v. McClung*, 379 U.S. 294, 303-04 (1964) ("[W]here we find that the legislators . . . have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end."), the mid-1990s saw a retrenchment in Commerce Clause jurisprudence beginning with the watershed case of *Lopez*. In *Lopez*,

the Court held that a statute which criminalized possession of a firearm in a school zone was beyond Congress's Commerce Clause authority. 514 U.S. at 552. In so holding, the Court stressed its concern that an overly expansive view of the Interstate Commerce Clause "would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *Id.* at 557 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. at 37). The Court reiterated these concerns five years later in *Morrison* in striking down a provision under the Violence Against Women Act: "[T]he concern . . . that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded." *Morrison*, 529 U.S. at 615.

In addition to announcing a shift to a more constrained view of Congress's power over interstate commerce, *Lopez* and *Morrison* ossified the three-category framework that the Court had long applied to interstate commerce cases. *See Lopez*, 514 U.S. at 558-59; *Morrison*, 529 U.S. at 609-14; *see also Raich*, 125 S. Ct. at 2215 (Scalia, J., concurring) (noting that for over thirty years, "our cases have mechanically recited that the Commerce Clause permits congressional regulation of three categories"). As noted earlier, these three familiar categories are (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *See Lopez*, 514 U.S. at 558-59. Within the interstate commerce arena, the guiding force of *Lopez* and *Morrison* quickly took firm hold, and lower courts have adhered closely to the three-prong structure. *See, e.g.*, *United States v. Adams*, 343 F.3d 1024, 1027-28 (9th Cir. 2003) (reciting the three categories set out in *Lopez* and *Morrison* and applying the third to a statute criminalizing the intrastate possession of child pornography).

This past term the Court introduced a new wrinkle in interstate commerce's jurisprudential fabric when it held that the

Controlled Substances Act was a valid exercise of Congress's powers under the Commerce Clause. *See Raich*, 125 S. Ct. at 2201. *Raich* did not alter the fundamental three-prong rubric, but the Court took a more generous view of Congress's power over interstate commerce than seen in *Lopez* and *Morrison*. Over the dissent's pointed objections, the majority concluded that "Congress had a rational basis for concluding that leaving home-consumed marijuana outside federal control would similarly affect price and market conditions." *Id.* at 2207. This "rational basis" for finding a nexus between home-consumed marijuana and the interstate market put the regulation "squarely within Congress' commerce power." *Id.* In tension with the majority's broad reading of Congress's power over interstate commerce, the dissent emphasized that setting "outer limits" to Congress's Commerce Clause powers "protect[s] historic spheres of state sovereignty from excessive federal encroachment." *Id.* at 2220 (O'Connor, J., dissenting).

Although the Supreme Court's view of the Interstate Commerce Clause has "evolved over time," *id.* at 2205, Indian Commerce Clause jurisprudence has been more of a straight line proposition. *See, e.g.*, *United States v. Lara*, 541 U.S. 193, 200 (2004) ("[T]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive' . . . This Court has traditionally identified the Indian Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, and the Treaty Clause, Art. II, § 2, cl. 2, as sources of that power.") (citations omitted). Indeed, the Supreme Court has commented on the "very different applications" of the Interstate and Indian Commerce Clause powers, explaining that interstate commerce jurisprudence "is premised on a structural understanding of the unique role of the States in our constitutional system that is not readily imported to cases involving the Indian Commerce Clause." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989). In contrast to the federal government's relationship with the states, its relationship with Indian tribes is "based on a history of treaties and the assumption of a

'guardian-ward' status." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). The Commerce Clause stands as one of the main textual grants of Congress's plenary power to regulate this special relationship between the federal government and Indian tribes. *Id.* at 551-52. In this context, the Court has defined Congress's authority under the Indian Commerce Clause without reference to the rigid categories of *Lopez* and *Morrison*. *See, e.g.*, *Lara*, 541 U.S. at 196, 200-207 (upholding Congress's authority to adjust tribal sovereignty in criminal matters under the Indian Commerce Clause without considering the three-category framework).

As with the Indian Commerce Clause, the Foreign Commerce Clause has followed its own distinct evolutionary path. Born largely from a desire for uniform rules governing commercial relations with foreign countries, the Supreme Court has read the Foreign Commerce Clause as granting Congress sweeping powers. *See Bd. of Trustees of Univ. of Ill.*, 289 U.S. at 59 ("[W]ith respect to foreign intercourse and trade[,] the people of the United States act through a single government with unified and adequate national power."); *see also* Rotunda & Nowak § 4.2 ("The Court has always recognized a plenary power in Congress to deal with matters touching upon foreign relations or foreign trade."); Robert J. Delahunty, *Federalism Beyond the Water's Edge: State Procurement Sanctions and Foreign Affairs*, 37 Stan. J. Int'l L. 1, 16-26 (2001) (describing the origins of the Foreign Commerce Clause). This view was laid down nearly two centuries ago when Chief Justice Marshall stated that "[i]t has, we believe, been universally admitted, that [the words of the Commerce Clause] comprehend every species of commercial intercourse between the United States and foreign nations." *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 193 (1824).

The Court has been unwavering in reading Congress's power over foreign commerce broadly. *See, e.g.*, *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 46 (1974) (stating that Congress's plenary authority over foreign commerce "is not

open to dispute"); *Buttfield v. Stranahan*, 192 U.S. 470, 492-93 (1904) (describing the "complete power of Congress over foreign commerce"); *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 813-14 (1993) (Scalia, J., dissenting) ("Congress has broad power under Article I, § 8, cl. 3, 'to regulate Commerce with foreign Nations,' and this Court has repeatedly upheld its power to make laws applicable to persons or activities beyond our territorial boundaries where United States interests are affected."). There is no counterpart to *Lopez* or *Morrison* in the foreign commerce realm that would signal a retreat from the Court's expansive reading of the Foreign Commerce Clause. In fact, the Supreme Court has never struck down an act of Congress as exceeding its powers to regulate foreign commerce.

Federalism and state sovereignty concerns do not restrict Congress's power over foreign commerce, *see Japan Line*, 441 U.S. at 448 n.13, and the need for federal uniformity "is no less paramount" in assessing the so-called "dormant" implications of congressional power under the Foreign Commerce Clause. *Id.* at 449; *see also Bd. of Trustees of Univ. of Ill.*, 289 U.S. at 59 (instrumentality of a state was not entitled to import articles duty free because "with respect to foreign intercourse and trade[,] the people of the United States act through a single government with unified and adequate national power"). By contrast, under the dormant Interstate Commerce Clause, "reconciliation of the conflicting claims of state and national power is to be attained only by some appraisal and accommodation of the competing demands of the state and national interests involved." *Southern Pac. Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 768-69 (1945).

**[6]** Clark's case illustrates the predominance of national interests and the absence of state sovereignty concerns in Foreign Commerce Clause jurisprudence. No state has voiced an interest in the proceedings nor is there an indication of any state interest at stake in determining the constitutionality of § 2423(c). Because this case is divorced from the common

federal/state interplay seen in the Interstate Commerce Clause cases, we find ourselves in sparsely charted waters. We thus look to the text of § 2423(c) to discern whether it has a constitutionally tenable nexus with foreign commerce.

**B.  SECTION 2423(C)'S REGULATION OF COMMERCIAL SEX ACTS IS A VALID EXERCISE OF CONGRESS'S FOREIGN COMMERCE CLAUSE POWERS**

Taking a page from *Raich*, we review the statute under the traditional rational basis standard. *Raich*, 125 S.Ct. at 2211. The question we pose is whether the statute bears a rational relationship to Congress's authority under the Foreign Commerce Clause.

[7] Although it is important to view the statute as a whole, parsing its elements illustrates why the statute fairly relates to foreign commerce. The elements that the government must prove under § 2423(c)'s commercial sex acts prong are straightforward. First, the defendant must "travel[ ] in foreign commerce." 18 U.S.C. § 2423(c). Second, the defendant must "engage[ ] in any illicit sexual conduct with another person," *id.*, which in this case contemplates "any commercial sex act . . . with a person under 18 years of age." 18 U.S.C. § 2423(f)(2). We hold that § 2423(c)'s combination of requiring travel in foreign commerce, coupled with engagement in a commercial transaction while abroad, implicates foreign commerce to a constitutionally adequate degree.

[8] Beginning with the first element, the phrase "travels in foreign commerce" unequivocally establishes that Congress specifically invoked the Foreign Commerce Clause. The defendant must therefore have moved in foreign commerce at some point to trigger the statute. In Clark's case, he traveled from the United States to Cambodia.

[9] "Foreign commerce" has been defined broadly for purposes of Title 18 of the U.S. Code, with the statutory defini-

tion reading, in full: "The term 'foreign commerce', as used in this title, includes commerce with a foreign country." 18 U.S.C. § 10. Admittedly, this definition is not particularly helpful given its rearrangement of the words being defined in the definition itself. Courts have understandably taken the broad wording to have an expansive reach. *See, e.g.*, *United States v. Montford*, 27 F.3d 137, 139-40 (5th Cir. 1994) (discerning that "Congress intended foreign commerce to mean travel to or from, or at least some form of contact with, a foreign state"); *Londos v. United States*, 240 F.2d 1, 6 (5th Cir. 1957) (concluding that foreign commerce under § 10 "means passing to and fro"). We likewise see no basis on which to impose a constrained reading of "foreign commerce" under § 2423(c). Clark got on a plane in the United States and journeyed to Cambodia. This act is sufficient to satisfy the "travels in foreign commerce" element of § 2423(c).

**[10]** Once in Cambodia, the second element of § 2423(c) was also met, namely, "engage[ment] in any illicit sexual conduct with another person," 18 U.S.C. § 2423(c), which in this case was commercial sex under § 2423(f)(2). As the Supreme Court recognized centuries ago, the Commerce Clause "comprehend[s] every species of commercial intercourse between the United States and foreign nations." *Gibbons*, 22 U.S. at 193; *see also Bd. of Trustees of Univ. of Ill.*, 289 U.S. at 56-57 (same). Section 2423(c) regulates a pernicious "species of commercial intercourse": commercial sex acts with minors.

**[11]** The statute expressly includes an economic component by defining "illicit sexual conduct," in pertinent part, as "any commercial sex act . . . with a person under 18 years of age." 18 U.S.C. § 2423(f)(2). "Commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(c)(1). Thus, in the most sterile terms, the statute covers the situation where a U.S. citizen engages in a commercial transaction through which money is exchanged for sex acts.

**[12]** The essential economic character of the commercial sex acts regulated by § 2423(c) stands in contrast to the non-economic activities regulated by the statutes at issue in *Lopez* and *Morrison*. *See Morrison*, 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity."); *Lopez*, 514 U.S. at 561 (explaining that firearm possession statute was purely a criminal statute). In both *Lopez* and *Morrison*, the Supreme Court voiced strong concerns over Congress's use of the Commerce Clause to enact "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Morrison*, 529 U.S. at 610 (quoting *Lopez*, 514 U.S. at 561). Like the statute regulating illicit drugs at issue in *Raich*, the activity regulated by the commercial sex prong of § 2423(c) is "quintessentially economic,"[17] 125 S. Ct. at 2211, and thus falls within foreign trade and commerce.[18]

---

[17] The evolving definition of "economics" presents a slight quirk to the analysis. Although the definition in the 1966 Webster's Third New International Dictionary cited by the Supreme Court in *Raich* only refers to "the production, distribution, and consumption of commodities," more recent versions of Webster's have added "services" to the definition. *See, e.g.*, Merriam Webster's Collegiate Dictionary 364 (10th ed. 1993) (defining "economics" as the social science concerned with "the production, distribution, and consumption of goods and services"); Merriam-Webster Online Dictionary, *available at* www.m-w.com (same) (last visited Dec. 29, 2005).

[18] It is now universally acknowledged that foreign trade or commerce includes both goods and services. *See, e.g.*, Agreement Establishing the Multilateral Trade Organization [World Trade Organization], Dec. 15, 1993, 33 I.L.M. 13, pmbl. ("Recognizing that their relations in the field of trade and economic endeavour should be conducted with a view to . . . expanding the production and trade in goods and services"); General Agreement on Trade in Services, Dec. 15, 1993, 33 I.L.M. 44, pmbl. ("Recognizing the growing importance of trade in services for the growth and development of the world economy"); *cf. Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 195 (1974)(holding that, under the Interstate Commerce Clause, the " 'in commerce' language of the Clayton and Robinson-Patman Act provisions . . . appears to denote only persons or

As in *Raich*, the fact that § 2423(c) has a criminal as well as an economic component does not put it beyond Congress's reach under the Foreign Commerce Clause. Indeed, § 2423(c) is far from unique in using the Foreign Commerce Clause to regulate crimes with an economic facet. *See, e.g.*, *United States v. Kay*, 359 F.3d 738, 741 (5th Cir. 2004) (describing "particular instrumentalities of interstate and foreign commerce that defendants used or caused to be used in carrying out the purported bribery" in violation of the Foreign Corrupt Practices Act); *United States v. Hsu*, 155 F.3d 189, 195-96 (3rd Cir. 1998) (discussing statute enacted as part of the Economic Espionage Act of 1996 that criminalizes the theft of trade secrets related to products "produced for or placed in interstate or foreign commerce"); *United States v. Gertz*, 249 F.2d 662, 666-67 (9th Cir. 1957) (explaining that statute criminalizing the forging or counterfeiting of foreign currency is based on the Foreign Commerce Clause).

**[13]** The combination of Clark's travel in foreign commerce and his conduct of an illicit commercial sex act in Cambodia shortly thereafter puts the statute squarely within Congress's Foreign Commerce Clause authority. In reaching this conclusion, we view the Foreign Commerce Clause independently from its domestic brethren.

Likewise, although our precedent illustrates that the interstate categories may be adapted for use in specific foreign commerce contexts, *see, e.g.*, *Cummings*, 281 F.3d at 1049 n.1, the categories have never been deemed exclusive or mandatory, nor has the Supreme Court suggested their application in relation to the Foreign Commerce Clause. *Cf.* Prakash, 55

activities within the flow of interstate commerce—the practical, economic continuity in the generation of *goods and services* for interstate markets and their transport and distribution to the consumer.") (emphasis added). *But see Lopez*, 514 U.S. at 585-89 (arguing that "commerce" as understood at the time of the ratification of the Constitution encompassed only bartering and trafficking in goods) (Thomas, J., concurring).

Ark. L. Rev. at 1166 ("Apparently, the Supreme Court has never discussed the applicability of the three-part *Lopez* test to gauging the limits of the foreign commerce power."). The categories are a guide, not a straightjacket. In *Cummings*, we upheld the constitutionality of the International Parental Kidnaping Crime Act ("IPKCA"), 18 U.S.C. § 1204(a). *See* 281 F.3d at 1051. In so holding, we applied the interstate commerce framework but noted that Congress has "broader power" in the foreign commerce area, and this context "is quite relevant to our inquiry." *Id.* at 1049 n.1. Critical to this understanding was the Supreme Court's now familiar statement in *Japan Line* that "the Founders intended the scope of the foreign commerce power to be . . . greater" as compared with interstate commerce. *Id.* (quoting *Japan Line*, 441 U.S. at 448).

At times, forcing foreign commerce cases into the domestic commerce rubric is a bit like one of the stepsisters trying to don Cinderella's glass slipper; nonetheless, there is a good argument that, as found by the district court, § 2423(c) can also be viewed as a valid regulation of the "channels of commerce." Our previous decisions have recognized that Congress legitimately exercises its authority to regulate the channels of commerce where a crime committed on foreign soil is necessarily tied to travel in foreign commerce, even where the actual use of the channels has ceased. *See Cummings*, 281 F.3d at 1050-51.

Clark emphasizes that § 2423(b) requires that the foreign travel be with the specific intent to engage in illicit sex, whereas § 2423(c) does not have such a specific intent requirement. Although the intent element distinguishes the two statutory crimes, we do not see that it distinguishes the scope of Congress's Constitutional authority. Under § 2423(b), the crime is contained solely within the "travels in foreign commerce" provision of the statute. Under the crime charged in this case, § 2423(c) and (f)(2), the crime requires both foreign travel and engaging in an illicit commercial sex

act. These are two different statutes with separate justifications under the Commerce Clause.

**[14]** In sum, Clark has failed to demonstrate "a plain showing that Congress . . . exceeded its constitutional bounds," *Morrison*, 529 U.S. at 607, in enacting §§ 2423(c) and (f)(2). Traveling to a foreign country and paying a child to engage in sex acts are indispensable ingredients of the crime to which Clark pled guilty. The fact that §§ 2423(c) and (f)(2) meld these economic and criminal components into a single statute does not put the conduct beyond Congress's reach under the Foreign Commerce Clause. The rational nexus requirement is met to a constitutionally sufficient degree. Congress did not exceed its power "to regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3, in criminalizing commercial sex acts with minors committed by U.S. citizens abroad.

**AFFIRMED**.

---

FERGUSON, Circuit Judge, dissenting:

The Constitution cannot be interpreted according to the principle that the end justifies the means. The sexual abuse of children abroad is despicable, but we should not, and need not, refashion our Constitution to address it. The majority holds that "travel in foreign commerce, coupled with engagement in a commercial transaction while abroad, implicates foreign commerce to a constitutionally adequate degree." Maj. op. at 1024. I respectfully disagree.

The Constitution authorizes Congress "[t]o regulate Commerce with foreign Nations." Art. I, § 8, cl. 3. The activity regulated by 18 U.S.C. § 2423(c), illicit sexual conduct, does not in any sense of the phrase relate to commerce *with foreign nations*. Rather, § 2423(c) is a criminal statute that punishes

private conduct fundamentally divorced from foreign commerce. Article I, section 8, clause 3, while giving Congress broad authority over our commercial relations with other nations, is not a grant of international police power. I respectfully dissent from the majority's assertion that the Commerce Clause authorizes Congress to regulate an activity with a bare economic component, as long as that activity occurs subsequent to some form of international travel. I also note that the conduct in this case will not go unpunished, as the reasonable course of action remains of recognizing Cambodia's authority to prosecute Clark under its own criminal laws.

## I.

Our national government is a government of "enumerated powers," *see* U.S. Const. art. I, § 8, which presupposes powers that are not enumerated, and therefore not accorded to Congress, *see Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 85 (1824). As such, the Commerce Clause is "subject to outer limits." *United States v. Lopez*, 514 U.S. 549, 556-57 (1995). Through a long line of cases, the Supreme Court has developed a tri-category framework that helps courts ascertain these outer limits, and whether a particular enactment exceeds them. *See*, *e.g.*, *Gonzales v. Raich*, 125 S. Ct. 2195, 2205 (2005). In the foreign commerce context, the majority would replace this time-tested framework with its own broad standard: whether a statute "has a constitutionally tenable nexus with foreign commerce." Maj. op. at 1024. The majority views the foreign commerce prong of the Commerce Clause "independently from its domestic brethren," *id.* at 1027, though Congress's authority in both spheres is governed by the same constitutional language: "[t]o regulate Commerce," art. I, § 8, cl. 3. In so doing, the majority goes farther than our precedent counsels and dispenses with the tri-category framework that has grounded Commerce Clause analysis in the modern era.[1]

---

[1] Though the majority asserts that it is applying "the traditional rational basis standard," maj. op. at 1024 (citing *Raich*, 125 S. Ct. at 2211), this

The majority portrays the raison d'etre of the tri-category framework as addressing "unique federalism concerns that define congressional authority in the *interstate* context." Maj. op. at 1004 (emphasis added) (citing *Lopez*, 514 U.S. at 557). It is thus able to conclude that this framework is generally inapplicable to foreign commerce cases. A fairer understanding of the tri-category framework is that it has evolved not only in response to federalism concerns that courts have read into Congress's Interstate Commerce power, but also to give content to what it means generally "[t]o regulate Commerce," art. I, § 8, cl. 3. *Cf. Lopez*, 514 U.S. at 551 (citing not only federalism concerns in invalidating 18 U.S.C. § 922(q), but also the fact that the statute "neither regulates a commercial activity nor contains a requirement that the [gun] possession be connected in any way to interstate commerce"); *United States v. Morrison*, 529 U.S. 598, 610 (2000) (noting that "the noneconomic, criminal nature of the conduct at issue" was central to the Supreme Court's decision in *Lopez*). While Congress's authority to regulate foreign commerce may well be broader than its authority to regulate interstate commerce, *see*, *e.g.*, *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979), its authority in the foreign sphere is not different in kind. In both spheres, Congress is only authorized "[t]o regulate Commerce," art. I, § 8, cl. 3, and not those activities that are fundamentally divorced from commerce. So

---

statement is misleading to the extent that rationality review in the Commerce Clause context is applied as part of the "substantial effects" test, which is a more demanding inquiry than the open-ended "nexus" inquiry that the majority proposes. *Compare Lopez*, 514 U.S. at 561-63, *with* maj. op. at 1024-29. Courts apply rationality review to assess whether Congress had a "rational basis" for concluding that a particular activity "substantially affects" interstate commerce, *Raich*, 125 S. Ct. at 2208, not to inquire generally "whether the statute bears a rational relationship to Congress's authority under the [ ] Commerce Clause," maj. op. at 1024. *Raich* is further distinguished by the fact that Congress's power to effectuate a comprehensive regulatory scheme was central to that opinion, *see* 125 S. Ct. at 2206-07, while no comparably general regulation of foreign commerce exists in this case.

while the majority correctly notes that "[f]ederalism and state sovereignty concerns do not restrict Congress's power over foreign commerce," maj. op. at 1023, it fails properly to consider the restrictions on the scope of Congress's Foreign Commerce power that emanate from the constitutional text itself, which the tri-category framework also helps elucidate.

II.

Under the tri-category framework, and contrary to the District Court's conclusion, § 2423(c) is not a regulation of the channels of foreign commerce. Section 2423(c) lacks any of the tangible links to the channels of commerce that would justify upholding it under Congress's Foreign Commerce power.

The Supreme Court has held that Congress's authority to regulate the channels of commerce encompasses keeping those channels "free from immoral and injurious uses." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964) (internal quotation marks omitted). Thus, Congress has the authority to criminalize the international transport of children for the purpose of sexual exploitation in the U.S. because such transport is an immoral and injurious use of the channels of commerce. *Cf. United States v. Hersh*, 297 F.3d 1233, 1238 (11th Cir. 2002) (upholding the conviction of a defendant who transported a Honduran boy to Florida to engage in sexual relations). Congress also has the authority to criminalize travel "for the purpose" of engaging in illicit sexual conduct, since travel with such harmful intent constitutes an injurious use of the channels of foreign commerce. *See*, *e.g.*, *United States v. Bredimus*, 352 F.3d 200, 207-08 (5th Cir. 2003).[2] We have not necessarily limited Congress's reach under its channels of commerce authority based on the cessation of movement. Thus, this Court found it a proper congressional

---

[2]The statute upheld in *Bredimus* was the former 18 U.S.C. § 2423(b), which preceded the present statute and which included an intent requirement.

exercise in *United States v. Cummings* to prevent persons from retaining children abroad after they first made use of the channels of foreign commerce wrongfully to remove the children from the U.S. 281 F.3d 1046, 1050 (9th Cir. 2002); *see also United States v. Shahani-Jahromi*, 286 F. Supp. 2d 723, 734 (E.D. Va. 2003) (holding that wrongful retention of a child in a foreign country, which impeded that child's travel back to the U.S. through the channels of commerce, provided a sufficient basis for Congress to exercise its Foreign Commerce power).

Under this rubric, the current 18 U.S.C. § 2423(b) contains a defensible link to the channels of foreign commerce, as it covers people who "[t]ravel with intent to engage in illicit sexual conduct." *See, e.g.*, Nick Madigan, *Man, 86, Convicted Under New Law Against Americans Who Go Abroad to Molest Minors*, N.Y. Times, Nov. 20, 2004, at A12 (defendant was arrested at Los Angeles International Airport with "dozens of pornographic photographs of himself with Filipino girls, sex toys and 100 pounds of chocolate and candy"). The activity regulated by § 2423(b), intention to engage in illicit sexual conduct, is at least tenably related to the channels of commerce in that the defendant engages in travel *with illegitimate ends*. The person indicted under § 2423(b) has a plane ticket in hand, has paid a travel agent to set up the trip, or has otherwise committed an act that is both wrongful (because of the criminal intent) and tangibly related to the channels of commerce.

By contrast, § 2423(c) neither punishes the act of traveling in foreign commerce, or the wrongful use or impediment of use of the channels of foreign commerce. Rather, it punishes future conduct in a foreign country entirely divorced from the act of traveling except for the fact that the travel occurs at some point prior to the regulated conduct. The statute does not require any wrongful intent at the time the channel is being used, nor does it require a temporal link between the

"travel[ ] in foreign commerce," 18 U.S.C. § 2423(c), and the underlying regulated activity.

The majority suggests that § 2423(c) "can [ ] be viewed as a valid regulation of the 'channels of commerce,' " maj. op. at 1028, because Congress's channels of commerce authority extends to regulating crimes committed abroad that are "necessarily tied to travel in foreign commerce," *id.* But whereas the requisite ties to the channels of commerce exist in the case the majority cites, *Cummings*, 281 F.3d 1046, these ties are entirely absent in § 2423(c). The statute in *Cummings* prohibited conduct — wrongful retention of children abroad — that was necessarily tied to injurious uses of the channels of commerce. The defendant in *Cummings* illegally transported his children to Germany so that he could retain them there, and his wrongful retention of them necessarily impeded their lawful use of the channels of commerce to return to the U.S. By contrast, § 2423(c) regulates an activity that is in no way connected to the wrongful use, or impediment of use, of the channels of foreign commerce. Section 2423(c) only requires that the regulated conduct occur *at some point* subsequent — perhaps even years subsequent — to international travel. The travel may well be lawful — the statute does not require any criminal intent during travel, nor does it otherwise connect the regulated activity to an abuse of the channels of commerce.

The mere act of boarding an international flight, without more, is insufficient to bring all of Clark's downstream activities that involve an exchange of value within the ambit of Congress's Foreign Commerce power. On some level, every act by a U.S. citizen abroad takes place subsequent to an international flight or some form of "travel[ ] in foreign commerce." 18 U.S.C. § 2423(c). This cannot mean that every act with a bare economic component that occurs downstream from that travel is subject to regulation by the United States under its Foreign Commerce power, or the Commerce Clause will have been converted into a general grant of police power. It is telling to note that, theoretically, the only U.S. citizens

who could fall outside the reach of § 2423(c) if they engage in illicit sexual conduct abroad are those who never set foot in the United States (i.e., U.S. citizens by virtue of their parent's citizenship), and thus never travel in "Commerce with foreign Nations." Art. I, § 8, cl. 3. In short, § 2423(c) is divorced from its asserted Commerce Clause underpinnings. The statute does not set another "guidepost" regarding Congress's Foreign Commerce power, *contra United States v. Clark*, 315 F. Supp. 2d 1127, 1135 (W.D. Wash. 2004) — it exceeds it.

## III.

Rather than engaging in a losing "channels of commerce" analysis, the majority applies a general "rational nexus" standard in this case, maj. op. at 1029, and strains to find more foreign commerce in § 2423(c) than the act of boarding an international flight. Specifically, the majority characterizes the crime regulated by § 2423(c), illicit sexual conduct, as sufficiently related to "Commerce with foreign Nations," art. I, § 8, cl. 3, to bring it under Congress's Foreign Commerce authority.

First, the underlying regulated activity is not "quintessentially economic," maj. op. at 1026, simply because it has a bare economic aspect. Just as "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity," *Morrison*, 529 U.S. at 613, neither is "illicit sexual conduct." The plain purpose of § 2423(c) is to regulate criminal conduct, not commerce. As the Supreme Court cautioned in *Lopez*, "depending on the level of generality, any activity can be looked upon as commercial." 514 U.S. at 565.

Further, the underlying act, even if considered economic or commercial, is certainly not a presence of commerce *with foreign nations*. In the most sterile terms, an act of paid sex with a minor that takes place overseas is not an act of commerce with other nations. Under the interpretation of the majority,

the purchase of a lunch in France by an American citizen who traveled there by airplane would constitute a constitutional act of engaging in foreign commerce. Under such an interpretation, Congress could have the power to regulate the overseas activities of U.S. citizens many months or years after they had concluded their travel in foreign commerce, as long as the activities involved some sort of exchange of value — even if the partner in exchange was a U.S. entity that funneled the value back into the American economy. Analogously, the statute here does not even facially limit its application to sex with foreign minors in an effort to create a tenable link to "Commerce with foreign Nations." Art. I, § 8, cl. 3. This observation may seem slightly absurd, but so is the task of trying to show how sexual abuse of a minor overseas by a U.S. citizen constitutes an act of "Commerce with foreign Nations." *Id.*

## IV.

Viewed as a whole, it is clear that § 2423(c) does not relate to "Commerce with foreign Nations." *Id.* Nor is § 2423(c) a constitutional exercise of Congress's authority to regulate the channels of commerce. Sexual exploitation of children by foreigners is thoroughly condemnable, but the question before us is whether Congress properly invoked its power "[t]o regulate Commerce with foreign Nations," *id.*, in enacting § 2423(c) to address this problem. It did not. I therefore respectfully dissent.