**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 09-2664

UNITED STATES OF AMERICA

v.

ANTHONY MARK BIANCHI
a/k/a Mark

Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Crim. No. 06-cr-00019-001)
District Judge:  Honorable Bruce W. Kauffman

Argued:  May 11, 2010

Before: BARRY, ROTH, <u>Circuit Judges</u> and HAYDEN,[*] <u>District Judge</u>

(Opinion Filed: July 2, 2010)

David Rudovsky, Esq. (Argued)
Jonathan H. Feinberg, Esq.
Kairys, Rudovsky, Messing & Feinberg
718 Arch Street
Suite 501 South
Philadelphia, PA 19106

---

   [*] Honorable Katharine S. Hayden, United States District Judge for the District of New Jersey, sitting by designation.

George W. Buehler, Esq.
Gregory R. Ellis, Esq.
Mark J. Geragos, Esq.
Eugene P. Harris, Esq.
Shepard S. Kopp, Esq.
Geragos & Geragos
644 South Figueroa Street
Los Angeles, CA 90017

Counsel for Appellant


Michael L. Levy, Esq. (Argued)
Mary C. Frye, Esq.
Paul G. Shapiro, Esq.
Robert A. Zauzmer, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

Counsel for Appellee

————————

OPINION

————————


BARRY, Circuit Judge.

Anthony Mark Bianchi appeals from the judgment of sentence, following a jury

trial, in this sex tourism case. He argues that: (1) the government violated his due process

and compulsory process rights by intentionally preventing a defense witness from

appearing at trial; and (2) 18 U.S.C. § 2423(c) (engaging in illicit sexual conduct in

foreign places) was beyond Congress's power under the Foreign Commerce Clause to

enact.  We will affirm.

## I.

This is an extremely disturbing case involving a defendant who repeatedly traveled around the world to meet and engage in sexual conduct with young boys.  In the sixteen-month span between December 2003 and March 2005, Bianchi traveled twice to the impoverished village of Trejubeni, Moldova and twice to Romania, each time seeking out boys between the approximate ages of twelve and fifteen.  Bianchi was assisted by his unindicted Moldovan co-conspirator, Ion Gusin, who served as a translator and helped Bianchi meet the boys and arrange sexual encounters.[1]  Bianchi attempted to ingratiate himself with these boys and their families by buying them gifts, giving them money, and taking them on outings.  He engaged in sexual conduct with several boys – including performing oral sex on them and anally raping them – and attempted to engage in sexual conduct with several others.

Law enforcement authorities intercepted Bianchi at the Philadelphia airport in March 2005 as he returned from Romania.  They searched his luggage and found a children's game, lubricant, a piece of paper containing the name and address of a Romanian boy (A.C.N.), a letter from "Mark" to an unspecified recipient discussing "the meaning of <u>true</u> friendship," and a travel notebook of sorts that the government

---

[1] Gusin was convicted in Moldova on charges of child trafficking and recruiting and transporting children for commercial sexual purposes.  He is serving a twenty-year prison sentence.

maintained was a log of sexual abuse. Among other evidence, Bianchi's telephone records showed nearly seventy calls to A.C.N. during a five-month period in 2005, and Bianchi had purchased airplane tickets to Thailand for an October 2005 trip for himself, Gusin, and M.M. (a victim he had met in Moldova and traveled with in Romania).

Bianchi was charged in a second superseding indictment with one count of conspiracy to engage in illicit sexual conduct in foreign places, 18 U.S.C. § 2423(e) (Count One); five counts of traveling with the intent to engage in illicit sexual conduct, 18 U.S.C. § 2423(b) (Counts Two, Four, Six, Eight, and Nine); four counts of engaging in illicit sexual conduct in foreign places, 18 U.S.C. § 2423(c) (Counts Three, Five, Seven, and Ten); and two counts of using a facility in foreign commerce to entice a minor to engage in sexual activity, 18 U.S.C. § 2422(b) (Counts Eleven and Twelve). He moved to dismiss the indictment on several grounds, including a challenge to Congress's constitutional authority to enact 18 U.S.C. § 2423(c) under the Foreign Commerce Clause. The District Court denied the motion.

Days before trial was set to begin, four of the victim-witnesses reported to U.S. officials in Moldova that they had just been approached at their homes by Serghei Gusin, Ion Gusin's brother, and Victor Levintsa, a Moldovan lawyer assisting Bianchi's defense team, who tried to dissuade them from coming to the United States to testify at Bianchi's trial. After the boys arrived in Philadelphia for the trial, they were interviewed by the prosecutors and Immigration and Customs Enforcement agents. Each boy identified Levintsa and reported him as saying things such as: "Aren't you afraid to go be a witness

against Mark [Bianchi] and Gusin?"; "The judge is black and has a face like a monkey, like King Kong and will scare you"; and "America is a very poor country, maybe you won't come back." (Supp. App. at 2-9.) Two days before trial, on July 14, 2007, the government notified the District Court and defense counsel that it was seeking an arrest warrant for Levintsa for witness intimidation, in violation of 18 U.S.C. § 1512(b)(1). Later that day, a magistrate judge issued the warrant.

Bianchi's counsel argued that the arrest warrant "completely scuttles the defense" because Levintsa was to serve as a critical defense witness. (App. at 282.) The parties disputed how important Levintsa was to the defense and whether defense counsel had actually been planning to call him as a witness. Indeed, the government told the District Court that it was unaware of even the possibility that Levintsa would be a witness until three hours *after* it informed defense counsel of the warrant. In response to the Court's concerns, however, the government withdrew the complaint and arrest warrant, and the Court made clear that it would enforce the government's representation that Levintsa would not be arrested if he traveled to the United States.

Nine of the alleged victims testified at trial and were cross-examined with their prior statements to the police and at Gusin's Moldovan trial, some of which were inconsistent with their testimony at Bianchi's trial. In addition, several adults Bianchi encountered in Romania testified that he expressed interest in meeting families with children.

Levintsa refused to come to the United States and defense counsel arranged for

him to testify by video from Moldova. Levintsa then executed a declaration stating that he was "no longer willing to cooperate with the defense of Mr. Bianchi due to the intimidation of both the United States Attorney General and the Moldovan Police" (Supp. App. at 31) because a Moldovan police officer had contacted him for questioning on the day he was to have given his video testimony. The government obtained a letter from the U.S. Ambassador to Moldova, stating that the interview requested by the Moldovan authorities was in no way connected to the U.S. Embassy, and confirming that Levintsa was not under criminal investigation and was free to come to the United States to testify. A letter of assurance from the Moldovan Ministry of Interior also promised that Levintsa was not the target of a criminal investigation, was free to leave Moldova, and could provide video testimony.

Levintsa continued to refuse to come to the United States or to testify by video. Faulting the government for having set this series of events in motion with its notification that it would seek an arrest warrant, the District Court permitted defense counsel to prepare and read to the jury an eight-page declaration by Levintsa, covering subjects such as tourism in Moldova, the practice of extortion, police interrogation tactics, his experience attending Ion Gusin's trial, and his interviews with several of the alleged victims, including what they told him and his impressions of their demeanor. Few of the government's objections were sustained, with the Court permitting what it called, in a remarkable understatement, "a certain amount of latitude" in light of the circumstances. (App. at 1189.) The Court instructed the jury that Levintsa's absence was not attributable

to Bianchi and that it should consider the declaration as if he had so testified in open court.

After a nearly three-week trial, the jury convicted Bianchi on all counts, except for Counts Six and Seven which had earlier been dismissed on the government's motion.[2] Bianchi filed a motion for judgment of acquittal or a new trial, arguing that the government's notification of its plan to obtain the arrest warrant deprived him of his ability to call Levintsa as a witness and benefit from his assistance during the trial. After several hearings in an effort, as the District Court put it, to "bend[] over backwards" for the defense (App. at 1608), the Court denied Bianchi's motion. It found "as a fact that the decision to notify Levintsa of the arrest warrant was designed to deter him from traveling to the United States to assist with [Bianchi's] trial" but that there was no evidence that the government knew that Levintsa would be a witness.[3] (*Id*. at 22-23.) The Court ultimately held that Bianchi was not prejudiced by Levintsa's absence at trial because the jury was read his declaration.

On May 27, 2009, the District Court sentenced Bianchi to concurrent 300 month terms of imprisonment on each of the counts of conviction, lifetime supervised release,

---

[2] With respect to Count Three (engaging in illicit sexual conduct in a foreign place, on or about December 2 through 24, 2003) and Count Five (engaging in illicit sexual conduct in a foreign place on or about January 17 through February 8, 2004), the jury found Bianchi guilty with respect to two of the three victims named in each count.

[3] The issue was only whether the notification was proper, not whether the government properly obtained the arrest warrant based on probable cause.

restitution of $47,951.20, a fine of $50,000, and a $1,000 special assessment.  Bianchi

timely appealed.[4]

## II.

## A.

Bianchi argues that the government intentionally prevented Levintsa from

appearing at trial, in violation of his Fifth Amendment right to due process and his Sixth

Amendment right to compulsory process.[5]  *See Lambert v. Blackwell*, 387 F.3d 210, 260

(3d Cir. 2004) ("Intimidation or threats from the government that dissuade a potential

witness from testifying may infringe" on these constitutional rights.).  As an initial matter,

Bianchi has not pointed to any evidence that the defense team was planning to call

Levintsa as a witness during trial; indeed, the first mention of this possibility was

apparently *after* the government announced its intention to seek a warrant for Levintsa's

arrest, and no witness statement of his had been provided although witness statements had

been ordered to be turned over pretrial.  Bianchi also argues that Levintsa would have

assisted the defense team during trial with his knowledge of Moldova, but has cited no

case holding that a defendant's Fifth or Sixth Amendment rights had been violated

---

[4] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

[5] There is "apparently little, if any, difference in the analysis" between Fifth Amendment due process and Sixth Amendment compulsory process claims.  *Gov't of Virgin Islands v. Mills*, 956 F.2d 443, 445 n.4 (3d Cir. 1992).

because he was deprived of this sort of trial assistance.[6]  But even assuming that Levintsa was going to testify for the defense, it is eminently clear that Bianchi was not prejudiced by his absence.  To the contrary, the declaration admitted in Levintsa's absence was far more favorable to the defense than Levintsa's testimony – which would have been subject to withering cross-examination – ever would have been.

We will assume for purposes of analysis, albeit with no great confidence, that the District Court correctly decided that the government intentionally prevented Levintsa's appearance at trial.  Contrary to Bianchi's suggestion, however, this was not a *per se* violation of his constitutional rights.  Rather, Bianchi was required to show that Levintsa's testimony would have been material and favorable to his defense.  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982); *Gov't of Virgin Islands v. Mills*, 956 F.2d 443, 446 (3d Cir. 1992).  Evidence is material "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact."  *Mills*, 956 F.2d at 446 (quoting *Valenzuela-Bernal*, 458 U.S. at 874); *see also United States v. Santtini*, 963 F.2d 585, 596-97 (3d Cir. 1992) ("As a general matter, even when actions by the prosecution appear to deprive a criminal defendant of his constitutional right to present a defense, no remedy will lie for such infringement absent a showing that the government has caused the unavailability of material evidence and has done so in bad faith.").

---

[6] To the extent that Bianchi argues that Levintsa would have provided trial assistance *and* served as a witness, there was a sequestration order in place during trial.

This standard was clearly not satisfied here.  Levintsa primarily proffered cumulative impeachment evidence.  Importantly, however, that evidence was in fact presented to the jury in the form of his declaration,[7] a declaration as to which defense counsel was given virtually free reign and which contains numerous statements that almost certainly would not have been admissible had Levintsa appeared at trial.  The government did not attack the veracity of Levintsa's statements or his credibility, and Levintsa was not subject to cross-examination.  Had he been, the government surely would have savaged him and might well have recalled the victims on rebuttal to tell the jury how Levintsa had intimidated them.  In short, Levintsa's live testimony would have been devastating – to the defense.

In these circumstances, even in the unlikely event that Levintsa would have been a witness at trial, there is no "reasonable likelihood that the testimony could have affected the judgment of the trier of fact" in "a probability sufficient to undermine confidence in the outcome."  *Mills*, 956 F.2d at 446 (citations omitted).  Accordingly, Bianchi's claims that the government violated his due process and compulsory process rights are without merit.

---

[7] Other courts have found that substituting other evidence for oral testimony is acceptable when a witness becomes unavailable due to some kind of government conduct. *See Buie v. Sullivan*, 923 F.2d 10, 12 (2d Cir. 1990) (police officer testified at trial regarding an exculpatory statement the non-testifying witness made about the defendant, when the witness was arrested before trial and declined to testify); *United States v. Capozzi*, 883 F.2d 608, 615 (8th Cir. 1989) (excerpts from earlier sworn deposition testimony from non-testifying witnesses presented to jury, when witnesses declined to testify after government named them as unindicted co-conspirators).

**B.**

Bianchi asks us to vacate his convictions on Counts Three, Five, and Ten, which charged him with engaging in illicit sexual conduct in foreign places, or attempting to do so, in violation of 18 U.S.C. § 2423(c). It bears repeating that he does not challenge, on grounds other than the Levintsa issue, his convictions on the other seven counts on which he received, along with the § 2423(c) counts, concurrent sentences of 300 months imprisonment. Nor does he seriously challenge the sufficiency of the evidence with respect to Counts Three, Five, and Ten.[8] Instead, he argues only that Congress exceeded its authority under the Foreign Commerce Clause when it enacted this statute.[9]

Section 2423(c) provides:

> Any United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person shall be fined under this title or imprisoned not more than 30 years, or both.

18 U.S.C. § 2423(c).[10] Illicit sexual conduct is defined as:

---

[8] Nor could he credibly do so. For example, E.C. (a victim named in Count Three) testified that Bianchi performed oral sex on him and paid him 200 lei in Moldovan money after E.C. stayed with Bianchi overnight. V.S. (a victim named in Count Five) testified that Bianchi left 400 lei at his home after he stayed overnight in the same bed as V.S. and touched him, saying that the money was for letting him sleep in the house. M.M. (the victim named in Count Ten) testified that Bianchi gave him a birthday gift of $300 during their trip to Romania, during which they engaged in sexual conduct.

[9] The Commerce Clause grants Congress the authority to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8 cl. 3.

[10] Section 2423(c) was enacted in 2003 as a provision of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT

(1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or (2) any commercial sex act (as defined in section 1591)[11] with a person under 18 years of age.

18 U.S.C. § 2423(f). Thus, the statute criminalizes both non-commercial and commercial illicit sexual conduct committed by U.S. citizens (or permanent residents) in foreign places, and the jury in this case was instructed as to both.[12]

The Ninth Circuit has held that § 2423(c) is constitutional with respect to commercial illicit sexual conduct, *United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007), and we find its reasoning persuasive as to that prong of the statute.[13] The *Clark* Court carefully considered the statute and concluded that "§

---

Act"), Pub. L. No. 108-21, 117 Stat. 650 (2003). *See United States v. Clark*, 435 F.3d 1100, 1104 (9th Cir. 2006). Unlike § 2423(b), § 2423(c) criminalizes the illicit sexual conduct itself and does not require that the defendant travel for the purpose of engaging in this conduct.

[11] "The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

[12] The District Court, over no objection, instructed the jury:

The term "illicit sexual conduct" means any one of the three following possibilities: (1) any commercial sex act with a person under eighteen years of age; or (2) knowingly engaging in a sexual act with a person below the age of consent; or (3) knowingly engaging in a sexual act with a person under the age of eighteen years of age by force by rendering the person unconscious or by using a drug or intoxicant to substantially impair the ability of a person to apprise or control the conduct.

(App. at 1342).

[13] Whether § 2423(c) is constitutional with respect to non-commercial sexual conduct was not an issue before the *Clark* Court.

2423(c)'s combination of requiring travel in foreign commerce, coupled with engagement in a commercial transaction while abroad, implicates foreign commerce to a constitutionally adequate degree." *Id.* at 1114. It pointed to the fact, and fact it be, that the Supreme Court "has been unwavering in reading Congress's power over foreign commerce broadly" and has never struck down a law as exceeding Congress's Foreign Commerce Clause powers. *Id.* at 1113; *see id.* at 1114 (noting "the predominance of national interests and the absence of state sovereignty concerns in Foreign Commerce Clause jurisprudence," in contrast to Interstate Commerce Clause cases); *see also Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979) ("[T]here is evidence that the Founders intended the scope of the foreign commerce power to be . . . greater" than the interstate commerce power.).

The Supreme Court's broad interpretation of the Foreign Commerce Clause applies with equal force to the non-commercial sexual conduct prong of § 2423(c), and Bianchi has simply not made the required "plain showing that Congress has exceeded its constitutional bounds" by enacting that prong of the statute. *United States v. Morrison*, 529 U.S. 598, 607 (2000) (stating that "due respect" for Congress demands that we presume its enactments to be constitutional). Bianchi ignores that "strong presumption," *id.*, of constitutionality and the statute's express requirement of travel in foreign commerce. *See id.* at 611-12 (noting that whether a statute includes an express jurisdictional element is an important consideration in Commerce Clause analysis) (citing

*United States v. Lopez*, 514 U.S. 549, 562 (1995)).[14]  Moreover, Bianchi has not even

attempted to persuade us that Congress did not have "a rational basis for believing that

failure to regulate the non-commercial sexual abuse of minors 'would leave a gaping

hole' in the PROTECT Act and its ability to regulate the commercial industry of child

prostitution." *United States v. Martinez*, 599 F. Supp. 2d 784, 808 (W.D. Tex. 2009)

(quoting *Gonzales v. Raich*, 545 U.S. 1, 22 (2005)).

We are satisfied that, given the substantial deference with which we review

Congress's determination that a statute is within its constitutional authority and the very

generalized nature of the challenge before us, we reach the correct result.  We wonder,

however, why, in circumstances such as those before us, the government would need or

even want to charge § 2423(c) violations when the evidence of § 2423(b) violations –

criminalizing interstate or foreign travel for the purpose of engaging in illicit sexual

conduct – is so clear.  *See United States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006)

(upholding the constitutionality of § 2423(b) in an interstate commerce case); *United

States v. Bredimus*, 352 F.3d 200, 208 (5th Cir. 2003) (upholding the constitutionality, as

applied, of § 2423(b) in a foreign commerce case).  In any event, we reject Bianchi's

Foreign Commerce Clause challenge to § 2423(c), and will affirm his convictions on

---

   [14]  We stress with respect to our dissenting colleague's discussion of the jurisdictional
element that we are not suggesting that § 2423(c) is constitutional simply because it
requires travel in foreign commerce, but only that such travel is a factor to consider in
Commerce Clause analysis.  And we are not holding that § 2423(c) is constitutional
because the activity here substantially affects foreign commerce.

Counts Three, Five, and Ten.

## III.

For the reasons we have set forth, the judgment of sentence will be affirmed.

**ROTH**, <u>Circuit Judge</u>, Concurring in part and Dissenting in part:

I concur with the majority except for its holding in Part II B. Because I believe that criminalizing non-commercial activity abroad exceeds Congress's power under the Foreign Commerce Clause, I cannot join in that holding. I therefore respectfully dissent as to it. Although, as the majority notes, Congress's foreign commerce power is broad, *see Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979), it has never been deemed unlimited. Congress may regulate activities that are *commercial* in nature or substantially affect foreign *commerce*. *See, e.g., United States v. Morrison*, 529 U.S. 598, 611 (2000) (holding that in all cases where federal regulation of local activity has been upheld, it was because "the activity in question has been some sort of economic endeavor"). However, Title 18 U.S.C. § 2423(c), as defined in section 2423(f)(1), reaches crimes that do not in any sense constitute "Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. I submit that section 2423(c) has a breadth of application that offends our Constitution. For that reason, it should be struck down.

In instructing the jury on the charges brought against Bianchi under section 2423(c), specifically, Counts 3, 5, and 10, the District Court did not distinguish between the commercial and non-commercial aspects of the statute, *i.e.*, § 2423(f)(1) and (f)(2); nor did the court provide the jury with special interrogatories to clarify the grounds for its findings. Instead, the District Court simply instructed the jury that, in order to convict, it

need determine only whether Bianchi "engage[d] in illicit sexual conduct outside of the United States." (App. at 1344-45.) For this reason, we cannot tell whether the jury based its guilty verdict as to Counts 3, 5, and 10 on a finding that Bianchi gave money or gifts in exchange for illicit sex, pursuant to section 2423(f)(2), or on a finding that Bianchi engaged in illicit sex with minors while abroad, pursuant to section 2423(f)(1). As a result, in order to uphold Bianchi's convictions on these counts, we must be satisfied that both prongs of the statute are constitutional.

The majority relies on the Ninth Circuit Court of Appeals' opinion in *United States v. Clark*, 435 F.3d 1100 (9th Cir. 2006), to establish that illicit commercial sex, under section 2423(c), is within Congress's foreign commerce power. The Ninth Circuit affirmed the defendant's conviction under section 2423(c) and (f)(2), finding the statute to be a valid exercise of Congress's Foreign Commerce Clause power. *Id.* at 1116-17. The court did not, however, decide the constitutionality of the non-commercial prong of section 2423(c). *See id.* at 1110 n.16. Indeed, the Ninth Circuit held only that "[t]he *combination* of Clark's travel in foreign commerce and his conduct of an illicit *commercial* sex act in Cambodia shortly thereafter puts the statute squarely within Congress's Foreign Commerce Clause authority." *Id.* at 1116 (emphasis added).

The majority goes on, however, to conclude that Bianchi did not make the required "plain showing that Congress has exceeded its constitutional bounds" by enacting the non-commercial sexual conduct prong of the statute. Majority at 13-14, quoting *Morrison*, 529 U.S. at 607. To the contrary, I find that there is no rational basis to

2

conclude that an illicit sex act with a minor undertaken on foreign soil, perhaps years after legal travel and devoid of any exchange of value, substantially affects foreign commerce. *See, e.g., United States v. Lopez*, 514 U.S. 549, 557, 559 (1995) (holding that Congress must have a rational basis for believing that the regulated activity *substantially* affects commerce). Where the perpetrator does not pay, or give other value, for the illicit interactions, the activity being regulated is not economic, and it is therefore beyond the reach of Congress's power under the Commerce Clause. *Cf. Clark*, 435 F.3d at 1103.

Nor does such activity substantially affect interstate commerce. Although Bianchi purchased a plane ticket to reach the situs of his crimes, section 2423(c) does not contemplate that the travel to get abroad be connected in any way to the subsequent illegal act. When a statute's jurisdictional element "is only tenuously related to the ultimate activity regulated," there can be no assurance that the regulated activity affects interstate commerce. *See United States v. Rodia*, 194 F.3d 465, 472-73 (3d Cir. 1999) (finding a statute's jurisdictional element that required materials, such as film or cameras, to have previously moved in interstate commerce to be "almost useless" in determining whether the ultimate activity regulated – possession of child pornography – substantially affected interstate commerce).

Section 2423(b) of the PROTECT Act criminalizes foreign travel with the intent to engage in the prohibited activity. However, when Congress added section 2423(c), it eliminated the intent element so that "the government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country."

3

H.R. Rep. No. 108-66 at 51 (2003). Section 2423(c) contains no intent requirement for the travel, nor does it provide that the "travels in foreign commerce" element coincide, precede, follow, or be within any specified time of the "illicit sexual conduct" element of the offense. Because Congress severed any jurisdictional tie to the prohibited activity, it is untenable to use the travel element of section 2423(c) to shoehorn a subsequent, unconnected crime into the category of activities that substantially affect foreign commerce.

If, in this case, the jury based its verdict on the sole fact that Bianchi engaged in illicit sex on foreign soil, which the court's instructions permitted it to do, Bianchi would stand convicted of a crime that Congress has no authority to regulate. Vesting Congress with such a general international police power would violate both Bianchi's constitutional rights and the limited nature of our federal government. I would vacate Bianchi's convictions on Counts 3, 5, and 10 and remand this case to the District Court for resentencing.

For the reasons stated above, I respectfully concur in part and dissent in part.

4